68 N.J. Super. 508 (1961)
172 A.2d 703
SAMUEL BUSCAGLIA, PLAINTIFF,
v.
OWENS-CORNING FIBERGLAS, DEFENDANT-THIRD PARTY PLAINTIFF-RESPONDENT,
v.
CATALYTIC CONSTRUCTION COMPANY, A DELAWARE CORPORATION, THIRD-PARTY DEFENDANT-APPELLANT, THIRD PARTY-PLAINTIFF,
v.
WILLIAM E. SNELL AND MAY SNELL, INDIVIDUALLY AND TRADING AS WILLIAM E. SNELL COMPANY, THIRD PARTY DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 19, 1961.
Decided July 10, 1961.
*510 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Herbert Horn argued the cause for third-party defendant-appellant, Catalytic Construction Company (Messrs. Lloyd, Horn, Megargee and Steedle, attorneys).
Mr. Carl Kisselman argued the cause for third-party plaintiff-respondent, Owens-Corning Fiberglas (Messrs. Kisselman, Devine, Deighan and Montano and Mr. Michael Patrick King, attorneys).
Mr. Samuel P. Orlando argued the cause for third-party defendants-respondents, William E. Snell and May Snell.
The opinion of the court was delivered by CONFORD, S.J.A.D.
This action originated with a complaint by Buscaglia against defendant and third-party plaintiff Owens-Corning Fiberglas ("Owens" hereinafter) to recover damages for injuries he sustained at its Barrington plant on April 8, 1957 while doing electrical wiring as an employee of third-party (actually fourth-party) defendants William E. Snell and May Snell ("Snell" hereinafter) in *511 the course of the latters' performance of a subcontract for electrical work under a contract by third-party defendant and third-party (actually fourth-party) plaintiff Catalytic Construction Company ("Catalytic" hereinafter) with Owens to do certain construction work in Owens' plant aforementioned. Owens claimed over against Catalytic in respect of the Buscaglia action on the basis of an indemnification clause, and another provision of the agreement with Catalytic allegedly breached by the latter; Catalytic, in turn, claimed over against Snell on an indemnification clause of the subcontract.
When the case came to trial, Owens settled Buscaglia's claim against it for $20,000, which the other parties have stipulated was a reasonable settlement of Buscaglia's claim of negligence against Owens. The other claims were then submitted to the late Camden County Judge Dzick, sitting in the Superior Court, Law Division, to be decided by him without a jury, on the basis of a stipulation of facts and pretrial depositions. The court held for Owens against Catalytic in the amount paid Buscaglia plus costs and counsel fees incurred in that regard. This conclusion was predicated both on the indemnification agreement in the contract and on the doctrine of restitution, activated by breach of another provision of the agreement mentioned above, by which Catalytic undertook to take all necessary safety precautions. But Judge Dzick found the provisions of the Catalytic-Snell subcontract too vague to ground Catalytic's claim over against Snell. Catalytic appeals both determinations.
Under the Owens-Catalytic contract the latter undertook to install machines and apparatus in the Owens plant to be used in its manufacturing operations. Specific work was ordered by "owner's purchase orders." In January 1957 Owens ordered from Catalytic, among other items, the installation and wiring of a "Process 20" machine and a monorail at its Barrington plant. When completed, the monorail would serve as a track for the movement of a *512 traveling overhead hoist crane to transport heavy parts of the Process 20 machine to other parts of the plant for cleaning. Power for the operation of the hoist crane was transmitted through contact with an electrically charged and exposed "buss" running along the monorail. The parts and fittings of the machine and monorail were supplied by Owens, and it also specified the design. The electrical work, including the wiring of the machine and electrifying the monorail, was subcontracted by Catalytic to Snell. The arrangements between Catalytic and Owens concededly contemplated that Owens' manufacturing operations would proceed while the contracted equipment was being installed.
On April 5, 1957 installation of the monorail was completed. Owens' personnel tested it and found it satisfactory. It was "green-tagged" as a finished part of the contract, turned over to the owner and accepted by it for its use. It was actually used by Owens each day thereafter prior to the accident to the plaintiff on April 8, 1957, and specifically on the Owens night shift the night before the morning of April 8, 1957. On that day plaintiff, an employee of Snell, and engaged on the Owens job but a short time, was wiring the Process 20 machine under the contract and subcontract aforementioned. He was working on top of the machine, high off the floor, near the energized monorail, when he either lost his balance or tripped upon catching his trousers cuff, and came into contact with the monorail, suffering burns and falling to the floor.
From the testimony it appeared that neither Catalytic nor Snell, nor their agents or employees, notified plaintiff that the current in the monorail was or may have been turned on. Nor did they make any effort to determine whether or not it was on. Buscaglia testified that although he knew the monorail was there and was operated by electricity, his foreman had told him at the time that "it was O.K. and everything was safe in that area to work." A field superintendent of Catalytic was present when the monorail was turned over to Owens on April 5, 1957. It was then tested and the power *513 shut off. After that Catalytic had no more to do with the monorail.
Resolution of the issues herein depends upon construction and application of the contract language. Two sections of the Owens-Catalytic contract are particularly material to the dispute between those parties. They follow:

"15. Use of Premises

Catalytic shall perform all work in such manner as not to interfere with use of premises by Owner or other contractors. Catalytic agrees that there shall be no interruption of Owner's manufacturing operations except as approved by Owner. Catalytic shall take all necessary precautions (including those required by Owner's safety regulations) to protect the premises and all persons and property thereon from damage or injury and shall assume responsibility for the taking of such precautions by Contractor's and subcontractor's employees, agents, licensees, and permittees and subcontractors. * * *

* * * * * * * *

19. Indemnify and Save Harmless

Catalytic shall, subject to the limits of insurance provided in Section 18, indemnify Owner and hold it harmless from and against all liability claims and judgments or demands from damages arising from accidents to persons or property occasioned by Catalytic, its agents or employees, and against all claims or demands for damages arising from accidents to Catalytic, its agents or employees, whether occasioned by Catalytic or its employees or any other person or persons and Catalytic will defend any and all suits that may be brought against the Owner on account of any such accidents and will make good to, and reimburse the Owner for any expenditures that said Owner may make by reason of such accidents."
Under section 18 of the contract Catalytic was required to maintain, in addition to workmen's compensation and employers liability insurance, comprehensive "general liability insurance" with bodily injury limits of $1,000,000 each person and $1,000,000 each accident, as well as property damage limits in the same amount. "This shall include Contractor's Protective Liability and Completed Operations Insurance, also Contractual Liability * * *." Catalytic was released as to any claims of Owens, including for bodily injuries, in excess of the limits of the insurance coverage specified.
*514 Quotation of the Catalytic-Snell contract is reserved for the treatment hereinafter of the claim over against Snell.

I.
We consider first Owens' claim against Catalytic as based upon the express agreement of indemnification. In this regard it is to be noted that the law of Ohio, which controls the construction of the agreement by express provision therein, has been stipulated by the parties (at the argument) to be substantially the same as that of New Jersey.
Catalytic argues that the agreement should not be construed to cover the instant claim because Owens had designed the monorail, with its exposed busses, and had exclusive possession and control of it at the time of the accident. It is argued that Catalytic had no right to shut off the power or interfere with use of the monorail by Owens. These circumstances, however, do not derogate from the fact that it was the direct responsibility of Catalytic, as against Owens, under the companion section 15 of the agreement, to see to the safety of the procedures being employed by its own and its subcontractor's agents and employees in carrying out the work contracted to be done. Catalytic knew the nature and dangerous propensity of the electrified monorail, having just finished installing it, and should have realized the hazard of inadvertent contact with it by a workman who would be as close to it as plaintiff was in performing the job assigned to him. Catalytic could easily have conferred with the Owens people for arrangements to turn off the monorail power current while the Process 20 machine was being wired, or to defer the wiring until a time convenient to Owens to turn off the current. Even a warning to Buscaglia of the danger might have averted the accident.
The circumstance that Owens retained control of the mechanism which directly effected the workman's injury will not derogate from Catalytic's continuing liability under an express indemnification agreement covering claims for injuries on the job occasioned by it if that circumstance *515 and the possibility of some inadvertent neglect by the Owens personnel or by the workman contributing to the injury could fairly have been within the contemplation of the parties as not lessening the obligation of indemnity, looking not only to the contract language but also to all the surrounding circumstances. Stern v. Larocca, 49 N.J. Super. 496, 501, 502 (App. Div. 1958); Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117 (App. Div. 1960); Polit v. Curtiss Wright Corp., 64 N.J. Super. 437 (App. Div. 1960); cf. George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20 (1954); Longi v. Raymond-Commerce Corp., 34 N.J. Super. 593 (App. Div. 1955); Cross v. Robert E. Lamb, Inc., 60 N.J. Super. 53 (App. Div. 1960). The Stern and Cozzi cases, supra, are particularly reflective of the present-day judicial view that indemnity clauses of construction contracts are to be viewed realistically as efforts by business men to allocate as between them the cost or expense of the risk of accidents apt to arise out of construction projects on a fairly predictable basis, rather than upon the generally debatable and indeterminate criteria as to whose negligence, if any, the accident was caused by, and to what degree. See Dayton Fabricated Steel Co. v. Dayton Town & Country, Inc., 99 Ohio App. 309, 133 N.E.2d 423, 425 (Ct. App. 1954). It is generally contemplated, as was here specifically arranged for in the contract, that the risk of accident claims will be covered by insurance, and the only practical feature of the bargain, ordinarily, is the decision as to who is to bear the cost of the insurance. See Cozzi v. Owens Corning Fiber Glass Corp., supra, 63 N.J. Super., at p. 126. Here it was Catalytic. It is significant here that Catalytic was required to carry contractual liability insurance, presumably to cover its liability to Owens on the very type of claim here in litigation. Note the cross-reference in section 19 to the insurance coverage provided in section 18.
We have no difficulty in agreeing with the late trial judge that, viewed in the light of the foregoing principles, it was *516 the intention of the indemnity clause quoted above to place the risk of such a claim as this upon Catalytic and to require it to indemnify Owens therefor.
Section 19 of the agreement is seen to express two distinct obligations of indemnity. Catalytic agrees to indemnify Owens and save it harmless from damages "arising from accidents to persons or property occasioned by Catalytic." Additionally, Catalytic undertakes such indemnification of Owens against claims "arising from accidents to Catalytic, its agents or employees" no matter by whom such accidents may be occasioned. We need not resolve the doubtful question whether Buscaglia was an "agent" (he clearly was not an employee) of Catalytic, within the meaning of the second category of indemnification mentioned, as we are firmly of the view that the indemnity clause is activated by reason of the fact that Catalytic "occasioned" the accident, within the proper meaning of that term in this context.
Accidents "occasioned by," in the light of the purposes and objects of an indemnity clause of a construction contract like this, means "accidents caused by," and more particularly, in this context, "caused by the work being performed by." See Gay v. S.N. Nielsen Company, 18 Ill. App.2d 368, 152 N.E.2d 468, 473 (App. Ct. 1958); Dayton Fabricated Steel Co. v. Dayton Town & Country, Inc., supra, 133 N.E.2d, at p. 425. Causation, not negligence, is the touchstone. There was a direct causal relation between Catalytic's or its agents' carrying on of the work and the occurrence of the accident; the condition for indemnification has therefore occurred. It makes no difference, in the light of the purpose and function which this clause was to play in regulating the allocation of costs and expenses as between Owens and Catalytic, that some causal contribution to the accident may have also emanated from the action or inaction of Owens' employees as well, or, for that matter, from the injured workman himself. It was in fair contemplation that such contribution might play a part in an accident covered by the indemnity. The accident was still *517 "occasioned" by Catalytic, within the meaning of the agreement.
If there were any doubt concerning the soundness of the foregoing construction of section 19 from what appears therein (together with the surrounding circumstances), it is dispelled by section 15, which, although we are finding it a distinct basis of liability in II, hereinafter, may properly be looked to for additional light as to the meaning of section 19, being part of the same contract, and, in a sense, in pari materia. Catalytic was to "take all necessary precautions * * * to protect the premises and all persons * * * thereon from * * * injury" as well as assume responsibility for such precautions by those working under it, including subcontractors. There was evidence that a Snell foreman had assured Buscaglia of the safety of the working conditions. These considerations fortify the conclusions that Owens was looking to Catalytic to save it harmless from any claim for personal injury arising out of the prosecution by or under Catalytic of the work contracted for and that this specific claim was covered by the indemnity clause.

II.
We are also in agreement with the holding of the trial court that in view of section 15 of the contract, the facts here presented justify Owens' invoking the principle of restitution enunciated by Section 95 of the Restatement, Restitution (1937). This reads:
"Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition." (Emphasis added)
*518 The application of the foregoing principle to the instant situation, in the light of the findings of fact of the trial judge, all adequately supported by the record, or of facts obvious from the record, is as follows. Owens neglected to make its premises safe for Buscaglia's work and therefore became liable to him in tort, along with Catalytic, whose negligence contributed to the injury. As between Owens and Catalytic, it was Catalytic's duty under section 15 (and perhaps section 19) of the agreement to guard against the hazard in respect of the proximity of the energized monorail to Buscaglia's work site. Therefore Owens is entitled to restitution from Catalytic for the expenditures it reasonably made in discharge of its liability.
The general doctrine under which this specific rule is subsumed is not unknown in this State. A cognate provision of the Restatement, Restitution, sec. 93, was applied in Popkin Bros., Inc. v. Volk's Tire Co., 20 N.J. Misc. 1, 23 A.2d 162 (Sup. Ct. 1941), by Circuit Judge (later Mr. Justice) Oliphant. Thus, also, another related provision of the Restatement, sec. 96, was applied to allow indemnity in favor of a party (airplane owner) who, without personal fault, had assumedly become subject to tort liability by reason of the wrongful conduct of another (maintenance of a television tower into which the plane crashed). Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80 (1960). In rejecting a claim for indemnification by the tower operator against the airplane owner the court in the same case distinguished the impermissible action for indemnification of one joint tortfeasor by another (32 N.J., at p. 81). The distinction from the latter rule in the instant case, of course, is the assumption of primary responsibility for the hazard by contractual undertaking of one of the joint tortfeasors in favor of the other. Other illustrations of the restitution rule may be found in The No. 34, 25 F.2d 602 (2 Cir. 1928); City of Brooklyn v. Brooklyn City R.R. Co., 47 N.Y. 475 (Ct. App. 1872); Seaboard Air Line Ry. Co. v. American Dist. Elec. Protective Co., 106 Fla. 330, *519 143 So. 316 (Sup. Ct. 1932); Kahler v. Liberty Mut. Ins. Co., 204 F.2d 804 (8 Cir. 1953); Read v. United States, 201 F.2d 758 (3 Cir. 1953); Weyerhauser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).
In finding that section 15 activated the restitution principle, we are eschewing, as unnecessary of resolution for purposes of determination of this appeal, the question whether Owens would be entitled to recover the amount of its payment to the plaintiff from Catalytic as damages, on conventional principles of contract law, predicated on the breach by the latter of its obligations of observing safety precautions pursuant to section 15. Cf. Rommell v. United States Steel Corp., 66 N.J. Super. 30, 46, 47 (App. Div. 1961), certification denied 34 N.J. 580 (1961).

III.
There remains for determination the question whether Catalytic is entitled to shift its liability to Owens over to Snell by virtue of the Catalytic-Snell contract, which reads:

"16. Risk of Loss:

It is further understood and agreed that all risks of loss and/or injury to personnel of Subcontractor and/or to the construction or automotive equipment involved hereunder, shall be for the account of the Subcontractor and Catalytic and Catalytic's Customer are hereby released and held harmless from any and all costs arising out of the damage or injury to said equipment or personnel."
We would be reasonably clear that a claim based upon this language might be sustained, were it one by Owens against Snell because of the claim it settled with Buscaglia, or one by Catalytic against Snell after satisfying a claim against it by Buscaglia. But we are unable to find that the provision clearly contemplates and covers a claim by Catalytic arising only by reason of its collateral agreement of indemnification of Owens. Catalytic drew this contract, and it must be construed against it in case of fair doubt as to *520 its scope, Moses v. Edward H. Ellis, Inc., 4 N.J. 315 (1950), particularly since it is a contract of purported indemnity. George M. Brewster & Son v. Catalytic Const. Co.; Longi v. Raymond-Commerce Corp., both supra. We are constrained to resolve the doubtful issue of coverage of this claim by the contract language against Catalytic.
Judgment affirmed.