Mike J. BATCHKOWSKY,
Plaintiff-Appellee,

v.

PENN CENTRAL COMPANY a/k/a Penn Central Transportation Company, Defendant and Third-Party Plaintiff-Appellee,

v.

ANHEUSER–BUSCH, INC.,
Third-Party
Defendant-Appellant.

No. 91, Docket 75–7204.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.

Decided Nov. 14, 1975.

York City, of counsel), for Anheuser-Busch, Inc.

Albert A. Juron, New York City (Juron & Minzner, New York City, of counsel), for Batchkowsky.

Robert M. Peet, New York City, for Penn Central Co.

Before LUMBARD, MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

Plaintiff, Mike Batchkowsky, formerly employed as a brakeman by Penn Central Company ("Penn Central"), brought this action against it under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, for personal injuries sustained as a result of an accident in the course of his employment, which occurred on a railroad siding on premises of third party defendant Anheuser-Busch, Inc. ("Busch"), allegedly because of the railroad's negligence. The action was tried before William C. Conner, *Judge*, and a jury, which awarded the plaintiff $200,-000, less $50,000 for contributory negligence, or a net of $150,000. Penn Central filed a claim over against Busch for indemnification pursuant to an agreement between them, which was tried simultaneously to Judge Conner without a jury and resulted in an award of the full amount in favor of Penn Central against Busch. The latter appeals, claiming that the trial judge erred in holding that the agreement entitled Penn Central to indemnity against Busch and that in any event the award to the plaintiff should have been set aside as grossly excessive. We affirm.

The accident occurred on November 8, 1968, at a railroad sidetrack at the Busch plant in Newark, New Jersey, as a Penn Central freight train was backing into the plant. As the train's brakeman, plaintiff had the duty of guiding the engineer in the process of backing the train into the building. Under conditions of normal clearance plaintiff's practice would be to ride the sideladder of one of the railroad cars, relaying signals between the conductor and the engineer. This practice could not be fol-

William K. Tormey, New York City (Bigham, Englar, Jones & Houston, New

lowed on the side track leading into the Busch building, however, for the reason that the space between the platform and railroad cars, some four inches, was too close. Plaintiff therefore stationed himself in a recessed area inside the doorway of the Busch building at the start of the loading platform, whence he could see and pass signals between the conductor inside the building and the engineer in his locomotive outside. As the freight cars were being slowly backed into the building plaintiff, facing the conductor, was struck successively by two handles protruding from a refrigerator car door, spun around and thrown to the ground; he suffered a severe sprain of the cervical area of the spine, sprain of the shoulder, laceration of the forehead, a probable fractured rib, and a low back sprain.

In February 1969 plaintiff commenced this action against Penn Central under FELA, claiming that his injuries were caused by Penn Central negligence in failing in its nondelegable duty to furnish him with a reasonably safe place in which to work. Penn Central, defending principally on the ground that the accident was due to plaintiff's negligence, also filed a third party complaint against Busch for indemnification under the terms of an agreement between Busch and Penn Central for the latter's construction on Busch's property of the sidetrack that later became the scene of the accident. The sidetrack agreement, as originally executed on February 24, 1950, contained mutual indemnification clauses. However, when Penn Central found that Busch, in order to build an additional loading platform, proposed to reduce the lateral clearance from eight feet (measured from the center of the rails to the nearest obstruction) to six feet, one inch, it first obtained from Busch a supplemental agreement, dated November 16, 1950, containing the following indemnification clause:

"3. The Industry hereby releases and waives all right or alleged right at any time to ask for or demand damages from the Railroad Company, or

its employes, that have occurred, or may occur, to the said Industry and the said structure, including loss of service thereof, caused by or growing out of the operation of the engines, equipment and cars of the Railroad Company upon the side-track adjoining said structure by reason of the 6′ 1″ side clearances as shown upon the print of plan attached hereto; and the Industry further covenants and agrees to indemnify and save harmless the Railroad Company and its employes from and against all loss, cost, damage and expense and claims and demands therefor caused by or attributable to the operation by the Railroad Company of its engines, equipment and cars upon the said side-track under and adjoining said structure, or injury to or damage caused thereto or thereby, and whether to the property of the Railroad Company or to property in its possession, control or custody, to its employes, patrons or licensees, to the employes, patrons or licensees of the Industry, or to persons or property of others who may seek to hold the Railroad Company liable therefor, and whether attributable in whole or in part to the said 6′ 1″ clearances."

Following the jury's verdict, Judge Conner, construing the agreement under the law of New Jersey (where the property was located and the accident occurred), held that the agreement obligated Busch to indemnify Penn Central for plaintiff's injuries.

## DISCUSSION

■ We agree with the parties and the district court that the construction of the Penn Central-Busch indemnity agreement, as supplemented by their agreement of November 16, 1970, is governed by New Jersey law. See *Haag v. Barnes*, 9 N.Y.2d 554, 216 N.Y.S.2d 65, 175 N.E.2d 441 (1961). New Jersey courts, paralleling the course taken by New York law, look to the parties' intent and, where that is debatable or ambigu-

ous, view such indemnity clauses "realistically as efforts by businessmen to allocate as between them the cost or expense of risk of accidents apt to arise out of construction projects on a fairly predictable basis," *Buscaglia v. Owens Corning Fiberglas*, 68 N.J.Super. 508, 172 A.2d 703, 707 (App.Div.1961), *affd.*, 36 N.J. 532, 178 A.2d 208 (1962). See *Polit v. Curtiss Wright Corp.*, 64 N.J.Super. 437, 166 A.2d 387 (App.Div.1960); *Cozzi v. Owens Corning Fiber Glass Corp.*, 63 N.J.Super. 117, 164 A.2d 69 (App.Div. 1960); *Stern v. Larocca*, 49 N.J.Super. 496, 140 A.2d 403 (App.Div.1958).

■ Applying these principles, the supplemental indemnity agreement clearly obligated Busch to indemnify Penn Central for the injuries caused to plaintiff as a result of Penn Central's operation of its equipment on the sidetrack adjoining the loading platform on Busch's premises. Busch argues that the agreement was intended to indemnify the railroad only for accidents that might occur "under and adjoining" the structure (loading platform) and be attributable to the 6' 1" clearance. We disagree. This stilted interpretation would rewrite the agreement and defeat the parties' intent. Busch agreed plainly and unqualifiedly to indemnify Penn Central from damage "caused by or attributable to the operation by [Penn Central] of its engines, equipment and cars upon the side-track under and adjoining said structure [loading platform]." The latter phrase clearly refers to the location where the equipment would be operated, not that where the damage or injury might occur. But even under Busch's narrow interpretation the word "adjoining" would include the location where plaintiff was struck, which was immediately next to the end of the loading platform.

■ Furthermore, although the reduction of the clearance to 6' 1" was the occasion for Penn Central's obtaining indemnification, the indemnity was not limited to accidents attributable solely to the reduced clearance but governed "whether attributable in whole or in part to the said 6' 1" clearance." Even under Busch's narrow interpretation Penn Central was protected, since the accident was due, at least in part, to the fact that because of the reduced clearance plaintiff was unable to follow his customary practice of relaying signals from the side ladder of one of the cars, which would have avoided contact with door handles. Indeed one of Penn Central's purposes in obtaining such broad indemnification may have been to protect itself against any increased risk of personal injuries accompanying its operation under the cramped conditions created by Busch's construction of the platform with less than the usual clearance. In any event, such prudent business judgment does not offend public policy. *Cozzi v. Owens Corning Fiber Glass Corp., supra*, 164 A.2d at 75.

■ Turning to Busch's contention that the judgment in favor of plaintiff should be reversed because of the excessiveness of the $200,000 verdict, the grounds upon which we are permitted to take such action are rather narrow. Where, as here, the trial judge, denying a motion for a new trial on grounds of excessiveness, has permitted a verdict to stand, we may order a new trial only when the verdict is irrational or so high as to shock the judicial conscience, rendering it an abuse of discretion not to set it aside. That we personally would have awarded a lesser sum or, if we had been the trial judge, have set the verdict aside, is insufficient. *Grunenthal v. Long Island Railroad Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed.2d 309 (1969); *Dagnello v. Long Island Railroad Co.*, 289 F.2d 797, 806 (1961).

■ Relying principally upon our recent decision in *DeMauro v. Central Gulf S.S. Corp. v. International Terminal Operating Co., Inc.*, 514 F.2d 403 (2d Cir. 1975) Busch argues that the $200,000 verdict, even reduced by 25% on account of plaintiff's contributory negligence,

was grossly excessive. *DeMauro,* while similar to the extent that it involved a $200,000 award for personal injuries, is otherwise clearly distinguishable. Indeed, it illustrates the error frequently encountered in attempting to equate one personal injury award with another. Aside from the rather strict standard by which we are bound, see *Grunenthal v. Long Island Railroad Co., supra; Dagnello v. Long Island Railroad Co., supra,* the differentiating facts in each case with respect to pain and suffering, anticipated work life expectancy, permanency of disability and other relevant factors, limit the precedential value of a court's treatment of awards in other apparently similar cases.

In *DeMauro* we conditionally reversed the $200,000 award for the reason that, notwithstanding undisputed evidence that the plaintiff was able to return to work, the jury's verdict appeared to be "based in large measure upon a finding of permanent disability from employment which was not justified by the testimony." (514 F.2d 405). The record in the present case, viewed most favorably to the plaintiff, reveals a quite different picture. Following the accident, Batchkowsky, 53 years old, with a work life expectancy of 12 years, complained of pain in his forehead, neck, chest, lower back and upper left extremity, pain on coughing and headaches. He had at least a 50% defect in rotation and bending, crepitating or crunching sounds on his moving his neck and an abrasion scar on his chest. A course of treatment was prescribed, including a neck brace or cervical collar, which he wore continuously. Although he returned to lighter work on May 28, 1969, almost six months after the accident, he continued to complain of severe pains, frequently visited the doctor, received pain-killing medication and could work only intermittently. By May, 1970, he was working only three days per week, and suffering progressively worse restriction in his neck motion and· shoulder mobility, muscle spasms and pain, loss of sensation or numbness, and nerve pinching in the neck. He continued to wear his neck collar and to receive medication for pain. Thereafter his condition deteriorated, accompanied by increased numbness and pain, diminished sensation and reflexes. In 1972 he ceased working altogether. By January 1975 his neck was almost completely rigid, with ability to rotate it only by turning his entire body. He was required to continue wearing the cervical collar. He suffered diminished grip, loss of sensation and weakness of the shoulders. In the opinion of the doctor who had treated him from 1968 to 1975 the plaintiff was totally disabled, with only the possibility of doing some type of very light work for which he had not been trained. Before becoming a brakeman he had been a truckdriver. Because of his disability, his driver's license was not renewed.

The jury could rationally have found that, in addition to approximately $12,000 in lost earnings during the period from the accident to May, 1972, the plaintiff, who earned $8,000 per year before the accident, would suffer a loss of approximately $64,000 because of complete disability during the balance of his work life expectancy. A total award of $76,000 for lost earnings is thus supportable on the record. Taking into account the severity and duration of his condition, which is degenerative and will grow progressively worse, an award of $124,000 for pain and suffering, although generous, cannot be labelled shockingly excessive. Although he had experienced some osteo-arthritis in his neck prior to the accident, his attending physician opined that, absent the injury to his neck, this condition would not have prevented him from continuing to perform his duties as a brakeman. Similarly, the jury could rationally have inferred that his condition was not attributable to or substantially aggravated by a subsequent accident which he sustained as a bus passenger on May 24, 1970, since an examination of him by his attending physician only six days before, on May 18, 1970, revealed that his condition had

**1126**

already degenerated beyond repair.[1] Upon such a record we cannot say that under the strict standard by which we are governed the verdict was so excessive as to require a remittitur, much less a reversal.

The judgments are affirmed.

LUMBARD, Circuit Judge (dissenting):

I dissent as to so much of the majority opinion as upholds the award of $200,000 to the plaintiff for the injuries suffered as a result of his accident at the Anheuser-Busch plant in Newark, New Jersey, on November 8, 1968. I agree with Judge Mansfield's analysis that approximately $125,000 of plaintiff's recovery represents compensation for his pain and suffering. I differ, however, from the characterization of that figure as merely "generous" and consider it to be grossly in excess of what is warranted by the record. Under all the circumstances, including the uncertain impact of plaintiff's subsequent accident in aggravating his injury, I feel that no more than $25,-000 can fairly be considered to be an appropriate award for Batchkowsky's pain and suffering.

Consequently, I would remand to the district court with directions to set aside the verdict and order a new trial unless, within a reasonable time, plaintiff is willing to accept a reduction of the judgment to $100,000, less the 25% subtracted for his contributory negligence.

---

1. Dr. Murray Burton, the physician who attended plaintiff from November, 1968, to January, 1975, testified:

> "Then I saw him on May 18, 1970. He told me that he had been losing time regularly, he was working only three days a week, and that the minute he tried any activity his neck became more painful. Examination showed severe restriction of neck motion, worse than it had been, with muscle spasm and pain, mobility of the shoulders was restricted, reflex activity indicating the integrity of the nerves was now diminished, and there was loss of sensation in the right hand in a patchy distribution. At this time I thought there was evidence of a so-called nerve pinching in the neck with pain radiating into the upper extremities. This was about the first time that I picked up any difficulties in sensation in his hands."