836 F.2d 113
 56 USLW 2381, 24 Fed. R. Evid. Serv. 577
 Patrick C. ATTRIDGE and Joyce Attridge, Plaintiffs-Appellees.
v.
CENCORP DIVISION OF DOVER TECHNOLOGIES INTERNATIONAL, INC.,
Defendant.
CENCORP DIVISION OF DOVER TECHNOLOGIES INTERNATIONAL, INC.,
Third-Party Plaintiff-Appellant,
v.
SYKES DATATRONICS, INC., Third-Party Defendant-Appellant.
 Nos. 249, 250, Dockets 87-7479, 87-7505.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 2, 1987.
Decided Dec. 30, 1987.
 
 Stephen G. Schwarz, Faraci, Guadagnino, Lange & Johns, Rochester, N.Y., for plaintiffs-appellees.
 James C. Gocker, Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y. (Patricia A. Hulley, of counsel), for defendant-third-party plaintiff-appellant Cencorp Div. of Dover Technologies, Inc.
 John P. Costello, Culley, Marks, Corbett, Tanenbaum, Reifsteck & Potter, Rochester, N.Y., for third-party defendant-appellant Sykes Datatronics, Inc.
 Before KAUFMAN, MINER and DAVIS,* Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 The American jury system, Alexis De Tocqueville observed, is "as direct and as extreme a consequence of the sovereignty of the people as universal suffrage." Accordingly, the sanctity of the jury room is among the basic tenets of our system of justice. Inquiries into the thought processes underlying a verdict have long been viewed as dangerous intrusions into the deliberative process. They undermine the finality of verdicts and invite fraud and abuse. We thus prevent jurors from impeaching their verdict to guard the jury's special place in our democratic heritage.
 
 
 2
 This practice, of course, requires the verdict to reflect the true intent of the jury. Unyielding refusal to question jurors is without sound judgment where the court surmises that the verdict announced differs from the result intended.
 
 
 3
 Here, after the jury was discharged, two jurors stated to a courtroom deputy that they had rendered a verdict different from the judgment announced. Once informed, the judge promptly recalled the jury for an inquiry. Concluding after questioning all jurors in chambers that they unanimously intended a verdict different from the one announced, the court wisely granted the plaintiffs' motion for entry of a corrected verdict despite objections from both defendants. This appeal ensued.
 
 
 4
 Appellee Patrick Attridge was employed as a maintenance engineer by third party defendant-appellant Sykes Datatronics (hereafter Sykes), a manufacturer of telecommunications equipment located in Rochester, New York. Among other duties, he was responsible for installation, upkeep and repair of electrical equipment.
 
 
 5
 On July 10, 1984, Attridge connected the company's new Mark V Profiler to a 110 volt power source. The Profiler, manufactured and sold by defendant-appellant Cencorp Division of Dover Technologies International (hereafter Cencorp), is used to cut circuit boards for computers. The operator places the circuit board on the machine's work surface, lowers a blade mechanism and cuts the board. Appellee had no prior experience with the machine.
 
 
 6
 On July 11, 1984, Attridge was asked to work on the Profiler again, this time to correct erratic behavior by the blade. He discovered that the machine's hydraulic motor, which controlled the blade mechanism, was wired for use with a 220 volt power source. After rewiring, the machine still did not cut accurately. Accordingly, Attridge lowered the blade mechanism and removed the machine's cover to make further adjustments. While he adjusted the machine, it inexplicably started. The blade mechanism returned to its upright position, crushing Attridge's left hand between the blade mechanism and the machine's steel top.
 
 
 7
 Because of this mishap, appellee suffered severed tendons in three fingers, also breaking a bone in one of them. He was hospitalized twice for surgical procedures. Today, he remains permanently partially disabled.
 
 
 8
 In June 1985, Attridge filed suit against Cencorp, alleging strict product liability, negligence and breach of warranty. His wife Joyce brought a derivative action for loss of consortium. Cencorp denied all liability, and contended that Patrick's injuries derived from his own negligence. Cencorp also brought a third party indemnification action against Sykes, charging that Sykes's negligence caused Attridge's injury. The trial commenced on March 23, 1987 before Judge Telesca of the United States Distrct Court for the Western District of New York.
 
 
 9
 In its charge to the jury, the court outlined Patrick's theories of liability. Regarding Cencorp's contributory negligence defense, he instructed the jury that if Patrick's own negligence contributed to his injury, "then the total award of damages to the plaintiff must be reduced by an amount equal to the percentage of fault or contributory negligence chargeable to the plaintiff." Thereafter, Judge Telesca addressed the question of damages. He stated that if the plaintiff prevailed on the issue of liability, the jury would be required to determine fair and adequate compensation for any injuries attributable to the defendant.
 
 
 10
 The court then turned to Joyce Attridge's claim for loss of consortium. The jury was instructed that loss of consortium claims are derivative, and that Joyce could recover only if Patrick recovered as well. The court failed, however, to inform the jury that, because loss of consortium claims are derivative, Joyce's recovery would be reduced in proportion to Patrick's contributory negligence.
 
 
 11
 Finally, the judge charged on Cencorp's indemnification claim against Sykes, instructing the jury to apportion liability between them.
 
 
 12
 Before deliberations commenced, the court provided the jury with a special verdict form containing ten questions. The first six questions recited the plaintiffs' various theories of liability and asked the jury to determine their applicability. Question seven asked, "What do you feel will fairly and adequately compensate plaintiffs for (A) personal injuries to Patrick Attridge? ... (B) loss of consortium to Joyce Attridge?" Question eight asked, "What is the percentage of responsibility chargeable to the defendant Cencorp, and what is the percentage of responsibility chargeable to the plaintiff Patrick Attridge?" The last two queries required the jury to apportion liability between Cencorp and Sykes.
 
 
 13
 The jury returned its verdict on April 2, at approximately 4:15 p.m. In response to the first five questions, it found that a defect in Cencorp's Mark V Profiler proximately caused the injury to Patrick Attridge, but that the plaintiff's own negligence contributed to his injury. In response to question six, the jury determined that Joyce Attridge could recover damages for loss of her husband's consortium.
 
 
 14
 It then turned to the question of damages and to the apportionment of responsibility. The seventh question asked the jurors what damages the plaintiffs had suffered. They responded by awarding Patrick Attridge $100,000 and Joyce Attridge $50,000, for a "Total Verdict Amount" of $150,000. In the eighth query, the jury held Patrick 80% responsible for his injury, assigning only 20% responsibility to the defendant, Cencorp. This would have yielded a net recovery of $20,000 for Patrick and $10,000 for Joyce, after reductions for Patrick's negligence.
 
 
 15
 Finally, the jury considered Cencorp's third party indemnification action against Sykes, dividing responsibility for the 20% portion of the verdict not attributable to the plaintiff's negligence. The jury determined that Sykes bore 75% of the fault and Cencorp 25%. Thus Sykes would pay 15% of the total verdict while Cencorp contributed 5%. The jury was polled and discharged, and the jurors returned to the pool of jurors available for future cases.
 
 
 16
 Shortly thereafter, two jurors asked a courtroom deputy to excuse them from further service due to personal hardship. During that conversation, the jurors expressed their belief that the $150,000 verdict represented the net recovery due the plaintiffs after any reductions for comparative negligence, rather than an unadjusted verdict. The deputy promptly informed Judge Telesca of this conversation.
 
 
 17
 The judge immediately sought to recall the jury and counsel for all parties. The hour was late and several of the jurors had already left the courthouse. The judge informed counsel what had transpired and ordered the jury recalled for the following morning at 9:30 a.m.
 
 
 18
 The following day, April 3, Judge Telesca met with counsel in chambers. The jurors were kept waiting outside, unaware of the purpose for their recall. The judge told counsel he intended to question each juror individually, on the record and in their presence, to ascertain whether the verdict announced reflected their true intent. Counsel for Cencorp and Sykes objected that the court was inducing the jurors to impeach their verdict. The court denied the objections and conducted the juror interviews.
 
 
 19
 The judge first interviewed the jurors whose encounter with the deputy had prompted the post-trial proceedings. In each case, he granted the request to be excused from further service. Then, without further discussion, he asked them, "What was your understanding as to what the verdict was?" Both jurors unambiguously stated they intended Patrick to receive $100,000 and Joyce to receive $50,000 after reductions. The other four jurors of this jury of six responded similarly.
 
 
 20
 The court delayed entry of judgment until April 15 to allow the parties to file any motions regarding the juror interviews. Sykes moved for a new trial based on jury confusion. Cencorp sought entry of judgment in the amounts of $20,000 for Patrick and $10,000 for Joyce. The plaintiffs moved to correct the record to reflect the verdict "actually" reached or, in the alternative, for a new trial. On April 17, the court granted plaintiffs' first motion and entered judgment of $100,000 for Patrick Attridge and $50,000 for Joyce Attridge.
 
 
 21
 Appellants Cencorp and Sykes challenge the corrected verdict. They argue that the post-trial interviews induced the jurors to impeach their original verdict, in violation of Rule 606(b) of the Federal Rules of Evidence. We find no violation of the rule and thus affirm.
 
 
 22
 As we have indicated, it is axiomatic that a jury may not impeach its own verdict. Indeed, the proposition can be traced to 1785, when Lord Mansfield refused to consider an affidavit from jurors admitting they had reached their verdict by drawing lots. Vaise v. Delaval, 1 T.R. 11, 99 Eng.Rep. 944 (K.B.1785). Over time, the rule has gained widespread adherence. It also has encountered substantial criticism. For example, it has been narrowed to permit juror testimony probative of certain categories of misconduct or mistakes in transmitting the jury's verdict to the court. See, e.g., Mattox v. United States, 146 U.S. 140, 150-51, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892); McDonald v. Pless, 238 U.S. 264, 268-69, 35 S.Ct. 783, 784-85, 59 L.Ed. 1300 (1915).
 
 
 23
 The rule serves three principle purposes: to promote free and uninhibited discourse during deliberations, to protect jurors from attempts to influence them after trial, and to preserve the finality of verdicts. 8 Wigmore Sec. 2353 (McNaughton Rev. 1961); Fed.R.Evid. 606(b) advisory committee's note. Thus, in McDonald, Justice Lamar warned:
 
 
 24
 [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.
 
 
 25
 238 U.S. at 267-68, 35 S.Ct. at 784.
 
 
 26
 Rule 606(b) of the Federal Rules of Evidence largely restates Lord Mansfield's broad prohibition against juror testimony. In pertinent part, it prohibits juror testimony:
 
 
 27
 [A]s to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith....
 
 
 28
 At the same time, however, the rule permits testimony that extraneous prejudicial information reached the jury's attention or that other improper external influences interfered with deliberations. Thus it reflects a cautious propensity to expand jurors' competence to testify, while avoiding wholesale divergence from centuries of practice. But it is silent regarding inquiries designed to confirm the accuracy of a verdict.
 
 
 29
 Rule 606(b), therefore, by its own terms, does not extend to juror testimony on the veracity of a verdict. Smith v. City of Seven Points, Texas, 608 F.Supp. 458, 462 (E.D.Texas 1985). Rather, juror testimony is admissible to show that the verdict delivered was not that actually agreed upon. University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 547-48 n. 43 (5th Cir.1974); Fox v. United States, 417 F.2d 84, 89 (5th Cir.1969); Young v. United States, 163 F.2d 187, 189 (10th Cir.), cert. denied, 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947). The permissibility of juror testimony hinges upon the purpose for which it is offered. Where the court seeks to correct the mistaken transmission of the verdict from the jury, evidence may be received. Freid v. McGrath, 135 F.2d 833, 834 (D.C.Cir.1943).
 
 
 30
 Appellants urge that the instant case most closely resembles Continental Casualty Co. v. Howard, 775 F.2d 876 (7th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). There, the appellate court upheld a lower court's refusal to receive a juror's affidavit alleging that the verdict entered was incorrect. The cases are distinguishable.
 
 
 31
 In Continental Casualty, as here, the affiant asserted that the jury intended a larger recovery than the verdict reflected. Initially, the plaintiff claimed the jury had awarded him recovery for two different items destroyed by fire, but that only one of those verdicts had been reported. He sought to support this contention with a juror's affidavit. The jurors had been polled, however, and had confirmed their verdict. Moreover, the affidavit simply stated that a larger verdict had been intended. It lent no direct support to plaintiff's claim that a second verdict sheet disappeared between the jury room and the court room. A search failed to disclose such a document. Lacking any objective basis to credit the juror's claim, the court determined that additional inquiry would necessarily intrude into the jury's thought processes. Because this is prohibited under Rule 606(b), the court declined to probe further. Continental Casualty, 775 F.2d at 885-86. The Court of Appeals agreed that the proffered affidavit did not advance the "assertion that the verdict announced was not the verdict that had been reached." 775 F.2d at 886. The court thus perceived no mistake that required correction.
 
 
 32
 The instant case, in contrast, involved correction of a clear miscommunication between the jury and the judge, similar to the facts in Mount Airy Lodge, Inc. v. Upjohn, Co., 96 F.R.D. 378 (E.D.Pa.1982). There, after the verdict had been announced, two jurors congratulated the losing counsel, raising concern the verdict had been incorrectly reported. The judge then conducted precisely the sort of in camera juror interviews at issue here. The interviews were proper because they were designed to ascertain what the jury decided and not why they did so.
 
 
 33
 Judge Telesca's stated purpose for conducting the interviews conformed precisely to this permissible inquiry. In his order denying appellants' motions to set aside the corrected verdict, he declared, "I intended to ascertain their true verdict so that the judgment entered in this case would accurately reflect the jury's ultimate findings and conclusions." Moreover, the judge carefully limited his inquiry to a single question: "What was your understanding as to what the verdict was; what was the jury verdict?" Thus the interviews were intended to resolve doubts regarding the accuracy of the verdict announced, and not to question the process by which those verdicts were reached. Accordingly, we affirm the district court's use of juror interviews to ascertain whether a mistaken verdict had been announced.
 
 
 34
 Appellants also challenge the corrected verdict as disproportionate to the injuries suffered. On May 13, 1987, the court denied appellants' motions to reduce the modified recoveries. Appellants now renew their contentions that the verdicts awarded were excessive and mandate either reduction or a new trial on the issue of damages.
 
 
 35
 A trial court's refusal to reduce a jury award will be accorded substantial deference, and will be reversed only for abuse of discretion. Nonetheless, a verdict must be set aside where it is so disproportionate to the injury suffered "as to shock the judicial conscience." Martell v. Boardwalk Enterprises, 748 F.2d 740, 750 (2d Cir.1984) (quoting United States ex rel. Larkins v. Oswald, 510 F.2d 583, 589 (2d Cir.1975)); Wheatley v. Ford, 679 F.2d 1037 (2d Cir.1982). This inherently imprecise calculation depends on careful analysis of the facts in each case. Comparisons with verdicts in "apparently similar" cases may provide some guidance, but are not determinative. Batchkowsky v. Penn Central Co., 525 F.2d 1121, 1124-25 (2d Cir.1975).
 
 
 36
 Under New York law, which controls here, the excessiveness of a verdict must be determined in relation to the gross award before any reductions for contributory or comparative negligence. Martell, 748 F.2d at 750 n. 4; Alvez v. American Export Isbrandtsen Lines, 79 A.D.2d 590, 434 N.Y.S.2d 384 (1st Dept.1980). Appellants present a litany of cases purportedly demonstrating that $500,000 is grossly excessive compensation for Patrick Attridge's crush injury to three fingers of his nondominant left hand. They note that aside from scarring, his hand is neither deformed nor disfigured. Also, he retains feeling and some range of motion in all three fingers. Appellants further observe that Attridge has continued to be employed in his chosen profession.
 
 
 37
 Attridge, in contrast, emphasizes the pain and suffering he endured during the accident and thereafter in therapy. The pain is ongoing and is exacerbated by the cold weather in which he must often work. He also asserts that he has a permanent limitation of motion in his injured hand, making it impossible for him to grip. Lastly, appellee raises the psychological impact of his injury.
 
 
 38
 Considering the evidence adduced by all parties, we cannot say that $500,000 represents an excessive verdict for the pain and suffering of a severe crush injury and the permanent diminution in use of three fingers. Accordingly, the verdict is affirmed.
 
 
 39
 Joyce Attridge presents a more difficult issue. She was awarded $50,000 but suffered primarily the loss of household services. We need not determine the appropriateness of this award, however, because the trial judge erroneously failed to instruct the jury that loss of consortium claims are derivative and must be reduced in proportion to the contributory negligence of the primary plaintiff. Maidman v. Stagg, 82 A.D.2d 299, 441 N.Y.S.2d 711 (2d Dept.1981). Accordingly, the damage award to Joyce Attridge is reversed and the case is remanded to the district court for further proceedings not inconsistent with this decision.
 
 
 
 *
 Honorable Oscar H. Davis, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation