**Kenneth RYAN, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civil Action No. 00–1613(JBS).**

United States District Court, D. New Jersey.

Dec. 11, 2002.

Robert Ian Segal, Segal, Gibney, Burns, and Cedar, Medford, NJ, for Plaintiff.

Christopher J. Christie, United States Attorney by John Andrew Ruymann, Assistant United States Attorney, Trenton, NJ, for Defendants, United States of America, United States Air Force, United States Army, and United States Army Corps of Engineers.

Judith A. Schneider, Koch & Corboy, Cherry Hill, NJ, for Defendant, Volmar Services, Inc.

Robert A. Berns, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Newark, NJ, for Defendant, A.R.G.C.

## OPINION

SIMANDLE, District Judge.

This action involves the interplay of landowner, contractor and subcontractor liability when a laborer employed by the subcontractor is injured while working on renovations at a government military base.

Plaintiff Kenneth Ryan alleges that while he was involved in demolition work on the Fort Dix, New Jersey military base, he fell from termite-infested ceiling joists and severely fractured his left foot. At the time, he was employed by defendant American Removal General Contracting ("A.R.G.C."). A.R.G.C. was the subcontractor for defendant Volmar Services, Inc. ("Volmar") which had contracted with defendant United States Army Corps of Engineers for the renovation of the housing units on the property owned by defendant United States of America.

Two motions are presently before this Court. The first is the motion of defendants United States of America, United States Air Force, United States Army, and United States Army Corps of Engineers ("federal defendants") for summary judgment on the claims contained in the complaint of plaintiff Kenneth Ryan and the cross-claims contained in the answer of defendant Volmar. The second is the motion of defendant A.R.G.C. Corporation for summary judgment in its favor on the cross-claims contained in the answer of defendant Volmar.

In the first motion, the federal defendants assert that summary judgment should be entered in their favor and that plaintiff Ryan's complaint and Volmar's cross-claims should be dismissed with prejudice as to them because the claims against them are barred by the doctrine of sovereign immunity. While the Federal Tort Claims Act (FTCA) waives such immunity over negligence claims, they argue that this case falls under the independent contractor and the discretionary function exceptions to the Act's waiver. Volmar and plaintiff Ryan, however, contend that summary judgment should not be entered because the discretionary function exception does not insulate the government here because government actors breached mandatory contractual duties. Volmar further argues that summary judgment should not be entered because the independent contractor exception does not apply here since Volmar's own status was that of an employee rather than a contractor.

In the second motion, defendant A.R.G.C. Corporation ("A.R.G.C.") asserts that summary judgment should be entered in its favor as to defendant Volmar's cross-claims because it is not liable for contribution or indemnity under the New Jersey Workers' Compensation bar. Volmar, however, argues that summary judgment is not appropriate because A.R.G.C. agreed in their subcontract to indemnify Volmar for claims arising from the negligence of A.R.G.C. or its employees.

This Court will grant in part and deny in part the federal defendants' motion for summary judgment. This Court will grant it to the extent that it asserts claims against the United States Air Force, the United States Army, and the United States Army Corps of Engineers because the FTCA only waives sovereign immunity to allow negligence claims to proceed against the United States itself, and not against its agencies. This Court will also grant it to the extent that it asserts claims against the United States for the negligence of its contractor, Volmar, or the subcontractor, A.R.G.C. because the claims are shielded by the independent contractor exception to the FTCA, and will grant it to the extent that it asserts claims against the United States for breach of a landowner duty of care because a landowner does not have a duty to inform a contractor about obvious risks of hazardous work. However, this Court will deny the motion for summary judgment to the extent that it asserts claims against the United States for the direct negligence of United States employees with respect to contractual duties to inspect and survey the work site.

This Court will then consider the motion of A.R.G.C. for summary judgment on the

cross-claims of Volmar and will grant summary judgment as to cross-claim one because it is barred by New Jersey's Workers' Compensation Act, as to cross-claim two because A.R.G.C. is not liable for implied indemnification because it is not in a special relationship with Volmar, and as to cross-claim four because A.R.G.C. cannot be required to indemnify Volmar in excess of the terms of the subcontract's indemnification clause. The motion as to cross-claim three will be granted in part to the extent that it seeks indemnification from A.R.G.C. for losses caused by Volmar's negligence and denied in part to the extent that it seeks indemnification from A.R.G.C. for losses caused by A.R.G.C.'s negligence because the terms of the subcontract's indemnification clause limit A.R.G.C.'s indemnification responsibility to losses caused by its, or its employees, negligence. Finally this Court will deny the motion as to cross claim five because questions of fact remain about whether A.R.G.C. provided the insurance that was required by the parties' subcontract.

## I. *PROCEDURAL AND FACTUAL BACKGROUND*

On April 20, 1998, plaintiff Kenneth Ryan fell while he was removing copper wiring from ceiling joists at a housing unit at the Fort Dix, New Jersey, military base. (Cordry Decl., Ex. A at Tr. 59:11–14, 66:12–69:6.) At the time of the fall, he was employed by defendant American Removal General Contracting (A.R.G.C.), a company that defendant Volmar Services, Inc. (Volmar) had subcontracted to work on the demolition project that Volmar had contracted with defendant United States Army Corps of Engineers to complete.

### A. *The Renovation Project*

On September 30, 1997, defendant United States Army Corps of Engineers ("Corps of Engineers"), as contracting offi-

cer for the United States, entered into contract number DACA51–97–C–0059 with Volmar for the renovation of military housing units at Fort Dix owned by defendant United States. (Kara Decl. ¶ 2.) Under the contract, Volmar was to make major interior and exterior renovations to 142 existing three- and four-bedroom housing units in the Garden Terrace Family Housing Area on Fort Dix so that they could be used as housing for Air Force personnel and their families. (Kara Decl. ¶ 3.)

The 790–page, eleven-million-dollar contract detailed with precision the job requirements. (Corboy Decl., Ex. A, Ex. B; Kara Decl., Ex. 1.) This Court will recount the contract's clauses that are pertinent to the present motions for summary judgment in the discussion section of this Opinion.

Volmar subcontracted necessary demolition work to A.R.G.C., whose president was Peter Young. (Ruymann Decl., Ex. 2 at Tr. 9:12–20.) The federal defendants did not have a contract with A.R.G.C. and did not participate in hiring A.R.G.C. (Ruymann Decl., Ex. 2 at Tr. 18:14–21, Ex. 3 at Tr. 41:1–21.) A.R.G.C. president Young took his directions from Volmar employees Andy Abdallah and Bill DiGiacomo. (Ruymann Decl., Ex. 2 at Tr. 20:24–23:17.) Mr. Abdallah was Volmar's Quality Control Manager and Mr. DiGiacomo was Volmar's Superintendent and Safety Officer for the Fort Dix project. (Ruymann Decl., Ex. 3 at Tr. 9:18–11:10.)

The demolition work began around the end of January 1998. (Ruymann Decl., Ex. 2 at Tr. 19:3–5.) The project was divided into phases. (Corboy Decl., Ex. K at 4.) During phase one, the parties worked on ten units in accordance with the original terms of the contract that required renovations of the units. Some portions of the exterior and interior of the housing units were demolished during phase one, but the housing structures were

saved.[1] (Kara Decl., Ex. 6 at Sheet 41, Gen. Demolition Notes 8 and 11.) During the work on the units in phase one, though, termite-damaged wood was discovered to a different extent in all of the units. (Ruymann Decl., Ex. 4 at Tr. 110:2–22; Corboy Decl., Ex. K at 10.) Each time it was found, A.R.G.C. notified Volmar which notified the Corps of Engineers and the parties would modify the contract so the termite-damaged wood could be replaced. (Ruymann Decl., Ex. 4 at Tr. 110:9–112:7, Ex. 3 at Tr. 159:10–160:22, 197:15–200:1.) After plaintiff's fall, because so much termite-infested wood had been found in the phase one housing units, the parties amended the contract to require complete demolition of the remaining housing units so all termite-damaged wood would be eliminated. (Ruymann Decl., Ex. 3 at Tr. 51:2–52:5.)

## B. *Plaintiff's Fall*

During phase one, before the contract was amended to require complete demolition because of the termite-damaged wood, plaintiff Ryan was working for A.R.G.C. on Building 1201, the eighth housing unit to be demolished at Fort Dix. (Ruymann Decl., Ex. 1 at Tr. 59:6–63:12.) Ryan had worked on the demolition work at the project on-and-off for about one month and had performed demolition work before. (Cordry Decl., Ex. A at Tr. 51:17–25; Ruymann Decl., Ex. 1 at Tr. 11:9–12:4, 191:8–18.) Ryan remembers that on April 20, 1998, either Rodney Williams, the A.R.G.C. foreman, or Peter Young, A.R.G.C.'s president, asked him to go into the eighth unit

and remove electrical wire that ran from the ceiling lamps. (Ruymann Decl., Ex. 1 at Tr. 63:3–20.) He claims that he was not told how to remove the wire, but admits that he did not need training on how to remove wiring from joists. (Ruymann Decl., Ex. 1 at Tr. 63:3–65:5, 213:24–214:16.) He decided to climb up the side of the walls to the ceiling joists and walk across them to reach the wire which was stapled to the ceiling joists. (Ruymann Decl., Ex. 1 at Tr. 64:20–66:15, 75:22–25.) Ryan says that when he was in the middle of the room, with his right foot on one ceiling joist and his left foot on another, he felt one joist begin to crack. (Ruymann Decl., Ex. 1 at Tr. 66:16–78:8.) As he started to fall, he says he grabbed another ceiling joist, but it also broke, so he fell to the ground, fractured his left foot, and was hit in the head by falling debris. (Cordry Decl., Ex. A at Tr. 77:7–78:8.)

Once on the ground, Ryan says that he noticed termite damage in the broken ceiling joists. (Cordry Cert., Ex. A at Tr. 85:1–17.) He and Mr. Abdallah, who was in charge of the day-to-day demolition, say that the termite damage was not visible from the exterior of the ceiling joists.[2] (Ruymann Decl., Ex. 1 at Tr. 85:18–86:21, Ex. 3 at Tr. 161:22–162:24.) Ryan was alone in the housing unit at the time of the accident. (Ruymann Decl., Ex. 1 at Tr. 69:10–15.)

## C. *Procedural History*

Ryan filed a complaint with this Court on April 4, 2000 asserting jurisdiction under the Federal Tort Claims Act, 28 U.S.C.

---

**1.** Sixty-four architectural drawings and the notes on them were incorporated into the contract. During phase one of the renovation, they called for electrical wiring and roof systems, including ceiling joists, to be removed. (*See e.g.* Kara Decl. ¶ 10; Kara Decl., Ex. 6, Sheet 41, Gen. Dem. Notes 8 and 11.)

**2.** Volmar presented a report of Richard E. Daniels, P.E., Consulting Engineers & Scien-

tists, Inc. (Corboy Decl., Ex. K.) In his report, Mr. Daniels quotes *Wood–Frame House Construction*, by L.O. Anderson, as revised by William Oberschulte, which states that "[s]ubterranean termites eat wood from the inside out. They can cause a lot of damage before it's visible." (*Id.* at 10.)

§ 2671 and alleging negligence by the federal defendants, Volmar, A.R.G.C., and John Does 1 through IV. [Docket Item 1–1.] A.R.G.C. filed an answer on July 5, 2000, adding cross-claims for contribution and indemnification against all other defendants. [Docket Item 6–1.] Volmar filed its answer on September 28, 2000, also adding cross-claims for contribution and indemnification. [Docket Item 12–1.] The federal defendants filed their answer on November 22, 2000, again adding cross-claims for contribution and indemnification against the other defendants. [Docket Item 15–1.] The federal defendants and A.R.G.C. then filed the present motions for summary judgment on May 30, 2002. [Docket Nos. 26–1, 33–1.]

On July 29, 2002, the claims of plaintiff Ryan against defendant A.R.G.C. and the cross-claims of the federal defendants against A.R.G.C. were dismissed with prejudice. [Docket Item 38–1.] The remaining claims at this time, therefore, are the claims of plaintiff Ryan against the federal defendants and against Volmar, the cross-claims of the federal defendants against Volmar, the cross-claims of Volmar against the federal defendants and against A.R.G.C., and the cross-claims of A.R.G.C. against the federal defendants and against Volmar. The two present motions for summary judgment will decide whether there remains any question of fact material to the resolution of the claims and cross-claims against the federal defendants by Ryan, Volmar, and A.R.G.C., or to the resolution of the cross-claims against A.R.G.C. by Volmar.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250, 106 S.Ct. 2505; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted).[3]

---

**3.** The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.1985), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); see Liberty Lobby, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly proba-

## B. *Federal Defendants' Summary Judgment Motion*

The federal defendants argue that all claims must be dismissed against them under the doctrine of sovereign immunity. They first argue that such immunity may only be waived under the Federal Torts Claims Act for suits against the United States, so that the claims against the United States Army, United States Air Force, and United States Army Corps of Engineers must be dismissed. Second, they argue that even though immunity may be waived under the Federal Torts Claims Act for certain suits arising in negligence against the United States, it is not waived in this case because it fits within the independent contractor and discretionary function exceptions. Finally, they argue that even if their immunity was waived, they were not negligent because they did not owe a duty of care to plaintiff.

■ Under the doctrine of sovereign immunity, the United States and its agencies cannot be sued unless there is consent to a waiver of sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Stehney v. Perry*, 101 F.3d 925, 933 (3d Cir. 1996). The terms of the waiver, which must be "unequivocally expressed," define the court's jurisdiction over such suits. *United States v. Nordic Village*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Sherwood*, 312 U.S. at 586, 61 S.Ct. 767. Waivers should not be liberally construed, but must be "construed strictly in favor of the sovereign ... and not enlarged beyond what the language requires." *Nordic Village*, 503 U.S. at 34,

112 S.Ct. 1011 (quoting *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983)). If there is no waiver, then the court does not have subject matter jurisdiction over the case. *United States v. Bein*, 214 F.3d 408, 415 (3d Cir. 2000); *Richards v. United States*, 176 F.3d 652, 654 (3d Cir.1999).

The Federal Tort Claims Act (FTCA) provides a partial waiver of sovereign immunity, allowing suit against the United States for certain negligent acts of federal employees. 28 U.S.C. § 2674.[4] As a waiver of sovereign immunity, it must be strictly construed. *Terrill Manor Assocs. v. U.S. Dept. of Housing and Urban Development*, 496 F.Supp. 1118 (D.N.J.1980) (citing *Sherwood*, 312 U.S. at 590–91, 61 S.Ct. 767). The extent of the waiver is at issue here.

### 1. Claims against the United States Air Force, Army, and Army Corps of Engineers

■ The FTCA waiver only waives immunity as to claims against the United States itself; it does not waive immunity for a claim brought against a government agency in its own name. *Scheimer v. Nat'l Capital Region*, 737 F.Supp. 3, 4 (D.D.C. 1990) (citing *Sprecher v. Graber*, 716 F.2d 968 (3d Cir.1983); *Hughes v. United States*, 701 F.2d 56 (7th Cir.1982)); *Lomax v. United States*, 155 F.Supp. 354, 356 (E.D.Pa.1957). This is because the FTCA allows a plaintiff to bring an action against the United States that alleges that the acts or omissions of United States employees

tive," the court may grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

4. 28 U.S.C. § 2674 provides, in pertinent part:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages ....

or agencies were negligent. The actions of federal employees and agencies are thus still very relevant to the action, but the United States is sued for them in its role as respondeat superior.

The federal defendants, thus, correctly argue that the only proper federal defendant in this case is defendant United States. As a result, because sovereign immunity has not been waived to allow the present claims against the United States Air Force, the United States Army, and the United States Army Corps of Engineers, this Court will dismiss all claims against them.

### 2. Claims against United States of America

The FTCA does provide a partial waiver of sovereign immunity to allow certain negligence actions to proceed against defendant United States. 28 U.S.C. § 2674. Here, plaintiff Ryan has alleged that the United States is liable for injuries caused (1) by the negligence of its contractor, Volmar, and of Volmar's subcontractor, A.R.G.C., and (2) by the negligence of its own federal employees. The United States argues that both claims are precluded by the independent contractor and the discretionary function exceptions to the FTCA's waiver of sovereign immunity. However, it is clear that the independent contractor exception, if applicable, can only shield the United States from liability for the acts of the contractor and subcontractor. *See Logue,* 412 U.S. at 532–33, 93 S.Ct. 2215; *Norman v. United States,* 111 F.3d 356, 358 (3d Cir.1997). The discretionary function exception, therefore will

determine whether it can be sued for its own alleged negligence.

### (a) Independent Contractor Exception

■ This Court finds that the independent contractor exception shields the United States from suit regarding any negligent actions of its general contractor, Volmar, or subcontractor, A.R.G.C. The independent contractor exception stems from the definition of "employee" in the FTCA. Under the FTCA, the United States is liable to the same extent as a private party for injuries that are "caused by the negligent or wrongful act or omission of any *employee of the Government* while acting within the scope of his office or employment …" 28 U.S.C. § 2671 (emphasis added). The definition of "employee of the Government" specifically excludes "any contractor [working] with the United States." *Id.* The "independent contractor exception" therefore means that the United States has not waived its sovereign immunity—and cannot be sued—if the claim alleges a negligent or wrongful action by an independent contractor. *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).

The principal distinction between an independent contractor and an employee is the extent to which the federal government "control[s] the detailed physical performance" of the job.[5] *Logue v. United States,* 412 U.S. 521, 528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Norman v. United States,* 111 F.3d 356, 357 (3d Cir.1997). If a federal actor supervises the day-to-day operations of the job, the contractor is

---

**5.** Some courts define the distinction by reference to the Restatement (Second) of Agency's "right to control" test:

When the person for whom services are performed retains the right to control the manner and means by which those services are to be accomplished and particularly

when that person provides supervision as to the details of the work, the workers are considered employees.

*See, e.g. Air Transit, Inc. v. NLRB,* 679 F.2d 1095, 1098 (4th Cir.1982) (quoting Restatement (Second) of Agency § 220 (1958)).

generally considered an employee of the government. *Orleans,* 425 U.S. at 815, 96 S.Ct. 1971. However, if the contractor manages the daily functioning of the job, with the federal actor just exercising broad supervisory powers, the contractor is likely an independent contractor, even if the government has reserved the right to inspect the contractor's work and monitor its compliance with federal law. *Orleans,* 425 U.S. at 815, 96 S.Ct. 1971; *Lipka v. United States,* 369 F.2d 288, 291 (2d Cir. 1966). The government can reserve such authority without transforming the contractor into an employee of the government because "[b]illions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government," and the government did not intend to accept responsibility for all of them under the FTCA. *Orleans,* 425 U.S. at 815–16, 96 S.Ct. 1971.

Applying the independent contractor exception to this case requires this Court to determine whether Volmar was an employee of the government or an independent contractor. If Volmar was an employee, the United States waived immunity for a claim regarding Volmar's negligence. If, however, Volmar was an independent contractor, summary judgment in favor of the United States is proper on claims seeking to hold the United States liable for Volmar's or its subcontractor A.R.G.C.'s negligence because this Court would lack subject matter jurisdiction over the claim under the FTCA's independent contractor exception.

In his brief, plaintiff Ryan's counsel seems to admit that Volmar was an independent contractor under the FTCA as it argues that the United States should be held liable for its direct negligence, rather than for the negligence of Volmar and A.R.G.C.[6] (Pl.'s Br. at 12–13.) Volmar, however, argues that the government can be held liable for its negligence because it was an "employee of the government" since the government retained day-to-day control over its actions through the provisions of an extensive and detailed contract.

This Court finds that Volmar was an independent contractor under the FTCA. While the contract between Volmar and the Corps of Engineers was extensive, it still relinquished day-to-day control of the work site to Volmar. The contract required Volmar to "directly superintend the work or assign and have on the work site a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for [Volmar]." (Kara Decl., Ex. 2.) The contract also required Volmar to "be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence." (*Id.*) Volmar was responsible for ensuring the quality of materials delivered and work performed. (*Id.*) To do so, Volmar was required, under the contract, to "maintain an inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements." (*Id.*) Volmar also needed to "provide and maintain work environments and procedures" to safeguard the public and the laborers. (*Id.*)

The contract also clearly placed all responsibility for demolition safety on Volmar, stating:

---

**6.** *See* Pl.'s Br. at 12–13 which states: [p]laintiff has no argument that the Federal defendant has correctly cited the law [regarding the independent contractor exception]. However, the employment of an independent contractor does not necessarily insulate the United States from liability for its own employees independent acts of negligence which occur in connection with the work of an independent contractor.

During the demolition work the contractor shall continuously evaluate the condition of the structure being demolished and take immediate action to protect all personnel working in and around the demolition site. No area, section, or component of floors, roofs, walls, columns, pilasters, or other structural element will be allowed to be left standing without sufficient bracing, shoring, or lateral support to prevent collapse or failure while workmen remove debris or perform other work in the immediate area ... The Contractor shall ensure that no elements determined to be unstable are left unsupported ....

(Section 02050, part 1.5.1). Likewise, the architectural notes which were incorporated into the contract stated that Volmar would be "solely responsible for and have control over all construction means, techniques, sequences and procedures and for coordinating all portions of the work required by the contract documents." (Kara Decl., Ex. 6 at Sheet No. 2 ¶ 18.) The notes also stated that Volmar would be "responsible for acts and omissions of the contractor's employees, sub-contractors and their agents and employees and any other persons performing any of the work under a contract with the contractor." (*Id.* at ¶ 20.)

The government did reserve the right to inspect Volmar's safety measures and observe Volmar's progress. (Kara Decl., Ex. 2.) However, the contract made clear that "Government inspections and tests are for the sole benefit of the Government and do not relieve the Contractor of responsibility for providing adequate quality control measures," and that "[t]he presence or absence of a Government inspector does not relieve the Contractor from any contract requirement." (*Id.*)

The contract thus shows that while the government exercised broad supervisory powers over Volmar, reserved the right to inspect Volmar's work, and maintained enough authority to compel Volmar to comply with federal law, it did not retain day-to-day control over Volmar's every action. The contract included precise specifications for Volmar to follow, but as the Supreme Court stated in *United States v. Orleans*, 425 U.S. 807, 816, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976),

by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts ... into federal governmental acts.

Accordingly, this Court finds that Volmar was an independent contractor. As such, the government cannot be held liable for any acts of negligence of Volmar or its subcontractor A.R.G.C.[7] and all such claims against the government must be dismissed.

**(b) Discretionary Function Exception**

This Court finds, though, that the United States can be sued for its own alleged acts of negligence because it is not shielded in this case by the discretionary function exception to the FTCA. The discretionary function exception is expressly provided for in the FTCA, which states that the United States does not waive sovereign immunity under the FTCA for claims based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the

---

**7.** No one has argued that A.R.G.C. was an employee of the government as it did not

contract directly with the government.

Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Congress created this discretionary function exception to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). The court must conduct a two-part inquiry to determine whether the discretionary function exception immunizes the government from suit. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954.

■ First, the court must determine whether the action was a matter of choice for the acting employee because conduct cannot be discretionary unless it involves an element of judgment or choice.[8] *Id.* at 536, 108 S.Ct. 1954 (citing *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)). To determine whether discretion is involved, the focus is on the "nature of the conduct." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). It is irrelevant whether the government employee actually balanced concerns in reaching the decision as long as the "conduct was of the type associated with the exercise of official discretion." *U.S. Fidelity*, 837 F.2d at 120. Such conduct includes:

> more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision, there is discretion.

*Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), quoted in *U.S. Fidelity*, 837 F.2d at 120.

If the conduct involves an element of judgment, the court must then determine whether the judgment "is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954. Because the exception was designed to protect policy decisions, if an "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The presumption is only overcome if the plaintiff can show that the "challenged actions are not the kind of conduct that [are] grounded in the policy of the regulatory regime." *Id.* at 324–25, 111 S.Ct. 1267 (explaining in footnote that such conduct would include negligent driving of motor vehicle which involves discretion but does not aid any regulatory policy).

■ Here, the plaintiff has alleged that the United States was negligent because it should have, or it should have required Volmar to: (1) conduct additional safety inspections, (2) arrange for an additional engineering survey, (3) review and revise the demolition plan when the termite damage was first identified, and (4) inform plaintiff about the danger of termite-damaged ceiling joists and prohibit him from climbing on them. (Pl.'s Br. at 12, 15.) The United States argues that the contract allowed it to decide whether to perform these acts, so the claims should be dismissed under the discretionary function exception.

The United States points to the contract's Accident Prevention Clause as proof of its discretionary role. The clause

---

8. Judgment is not involved if the Constitution or a federal statute, regulation, or policy specifically prescribes a course of action. *Berko-* *vitz*, 486 U.S. at 536, 108 S.Ct. 1954; *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir.1988).

did delegate the responsibility to Volmar to conduct safety inspections.[9] It was included in the contract pursuant to Federal Acquisition Regulation ("FAR") 52.236–13 [10] and 48 C.F.R. § 52.236–13 [11] and several courts have found that it validly delegates safety inspections to the contractor, and leaves further government inspections to the discretion of the government. *See White*, 656 F.Supp. at 34–35 (finding clause provides government with discretion);

9. The government could delegate responsibility for safety to its contractor, Volmar. Government contracts that "delegate primary work site safety to the independent contractor pursuant to FAR, while leaving to itself an oversight role, are examples of policy choices protected by the discretionary function exception." *Gen. Pub. Util. Corp. v. United States*, 745 F.2d 239, 243 (3d Cir.1984); *see also Kandarge v. United States Dep't of the Navy*, 849 F.Supp. 304, 309 (D.N.J.1994); *White v. United States Dep't of Interior*, 656 F.Supp. 25, 33 (M.D.Pa.1986), aff'd 815 F.2d 697 (3d Cir.1987). Therefore, the government is not liable for simply deciding to delegate safety responsibility.

10. The FAR, codified in Title 48 of the Code of Federal Regulations, were promulgated pursuant to the Office of Federal Procurement Policy Act to:

promote economy, efficiency, and effectiveness in the procurement of property and services by the executive branch of the Federal Government by .... establishing policies, procedures, and practices which will provide the Government with property and services of the requisite quality, within the time needed, at the lowest reasonable cost.

41 U.S.C. § 401(2).

11. The clause states, in part:

(a) The Contractor shall provide and maintain work environments and procedures which will (1) safeguard the public and Government personnel, property, materials, supplies and equipment exposed to Contractor operations and activities; (2) avoid interruptions of Government operations and delays in project completion dates; and (3) control costs ...

(b) For these purposes on contracts for construction or dismantling, demolition, or re-

*Clark v. United States Dep't of the Army*, 805 F.Supp. 84, 88 (D.N.H.1992); *Doud v. United States*, 797 F.Supp. 138 (N.D.N.Y. 1992).

The Accident Prevention Clause, however, is not the only clause in the record. Here, the contract included a Differing Site Conditions clause which states, in pertinent part:

(a) The Contractor shall promptly, and before the conditions are disturbed,

moval of improvements, the Contractor shall—

(1) Provide appropriate safety barricades, signs, and signal lights:

(2) Comply with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910; and

(3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for the purposes are taken.

(c) If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385–1–1 ...

(d) Whenever the Contracting Officer becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request immediate initiation of corrective action.... After receiving the notice, the Contractor shall immediately take corrective action....

(Corboy Decl., Ex. E; Kara Decl., Ex. 2.) The clause refers to 29 C.F.R. § 1926, which includes a provision that states:

(1) It shall be the responsibility of the employer [which is the contractor, *see* 29 C.F.R. § 1926.16(b)] to initiate and maintain such programs as may be necessary to comply with this part.

(2) Such programs shall provide for frequent and regular inspections of job sites, materials, and equipment to be made by competent persons designated by the employer.

29 C.F.R. § 1926.20(b)(1) and (2).

give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer [12] shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(Corboy Decl., Ex. E at 700–80.) Under this clause, the government had a mandatory duty to investigate site conditions if notified of them by Volmar. The record

**12.** The "Contracting Officer" is the Corps of Engineers.

**13.** The federal defendants argue that the Pre–Construction Safety Conference Outline, prepared after the contract was awarded to Volmar, did not alter the terms of the contract or create additional contractual duties. (Defs.' Reply Br. at 16.) In support, they present deposition testimony from Paul Jalowski, the Corps of Engineers Resident Engineer, who said that he did not think the document imposed contractual obligations. (Corboy Decl., Ex. H at Tr. 47:14–48:16.) Jalowski also testified that the document was prepared by the government, (*Id.* at 52:8–11), and was tailored to the Fort Dix project, (*Id.* at 53:13–20). It was signed for Volmar by Mr. Abdullah. (Corboy Decl., Ex. I.)

Parties to an existing contract may, by mutual assent, modify or add to the terms of the

includes evidence that the government was notified about termite damage in the seven units worked on before the one where the accident occurred. (Ruymann Decl., Ex. 4 at Tr. 110–13; Corboy Decl., Ex. K at 10.) The record also includes the Pre–Construction Safety Conference Outline,[13] presented by the government and signed by Andy Abdallah for Volmar, which states, in part:

**Government Project Office Responsibilities**

Southern Residency Responsibilities [14]

(1) The Southern Residency is responsible for identifying the hazards associated with each construction operation and for familiarizing themselves with the applicable safety requirements, safety standards, and codes established for the control of these hazards.

(2) The Southern Residency will interpret safety requirements for the Prime Contractor, Volmar Services, Inc., when requested and will assist Volmar Services, Inc. to analyze and resolve job safety problems.

contract. *County of Morris v. Fauver,* 153 N.J. 80, 99, 707 A.2d 958 (1998). The proposed modification by one party must be accepted by the other and must be supported by new or additional consideration. *Id.* at 100, 707 A.2d 958 (citing *Ross v. Orr,* 3 N.J. 277, 282, 69 A.2d 730 (1949)). Here, any additions to the contract contained in the Pre–Construction Safety Conference Outline were proposed by the Army Corps of Engineers and were accepted by Volmar as shown by Mr. Abdullah's signature. Additional consideration, in the form of mutual promises, supported the document. *See Oscar v. Simeonidis,* 352 N.J.Super. 476, 485, 800 A.2d 271 (App.Div.2002). Therefore, its terms created contractual responsibilities on the part of Volmar and the United States.

**14.** The "Southern Residency" is the government office administering the Fort Dix contract. (Corboy Decl., Ex. H at 44.)

(3) The Southern Residency is responsible for making the necessary inspections of the work and for observing the actions of the workmen to see that safe working procedures are maintained and that the work is being performed as planned. Any violations of safety requirements observed during these inspections will be brought to the attention of Volmar Services, Inc., the Prime Contractor, representative on the site for prompt on-the-spot correction.

(Corboy Decl., Ex. I at 7.) The document also included a section entitled "Job Safety surveys," which stated:

(A) Weekly job site safety surveys will be performed by personnel from the Southern Residency. Survey forms will be completed and a copy transmitted to Volmar Services, Inc.

(B) These inspections will be in addition to daily inspections conducted by the Corps of Engineers' representative assigned to the project.

(C) If the Corps of Engineers' representative encounters any safety violations, they will be documented in the daily report and recorded on. Volmar Services, Inc. is required to acknowledge receipt of this form.

(Corboy Decl., Ex. I at 14.) These provisions evidence a mandatory government duty to inspect the site daily and weekly and to take action to report and remedy safety violations. The government argues that this was simply a "procedure utilized by the government to ensure compliance with the Contract" and so should still be

sheltered by the discretionary function exception. (Defs.' Br. at 16.) This Court disagrees. The government may have decided to include such provisions when it did not have to, and may have included them for the purpose of compelling Volmar to abide by high safety standards, but when such provisions were included, the government gave itself certain safety inspection duties under the contract.[15] Therefore, immunity over claims relating to the mandatory duties was not retained by the discretionary function exception, and this Court must consider plaintiff's claims of the United States' own negligence.[16]

### (c) Negligence claims

■ To sustain a claim against the United States under the FTCA, plaintiff Ryan must show that the United States would be liable as a private person under New Jersey negligence law. *Bushman v. Halm*, 798 F.2d 651, 655 n. 7 (3d Cir.1986); *Merklin v. United States*, 788 F.2d 172, 173 (3d Cir.1986). To state a cause of action for negligence in New Jersey, a plaintiff must show (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately cause injury to the plaintiff. *Brown v. Racquet Club of Bricktown*, 95 N.J. 280, 471 A.2d 25 (1984); *Gilleski v. Community Medical Center*, 336 N.J.Super. 646, 652, 765 A.2d 1103 (App.Div. 2001).

Here, the United States argues that it is not liable under the FTCA because it did

---

**15.** *See, e.g. Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 292 (9th Cir.1989) (explaining that once government makes discretionary policy judgment to retain safety obligations, performing them does not involve policy judgment).

**16.** This holding that the United States is not shielded by the discretionary function excep-

tion in this case means that this Court must consider claims of negligence, but *only* if they relate to an alleged breach of the mandatory duties that the United States accepted in the contract. As explained *supra* in section II(B)(2)(a), the United States *cannot* be held liable for any acts of negligence that were caused by the negligence of its contractor Volmar or the subcontractor A.R.G.C.

not owe a duty of care to the plaintiff because a landowner does not have a duty in New Jersey to protect a contractor's employee from inherent hazards on the job, and that even if it did owe a duty of care to the plaintiff, it did not breach that duty. Plaintiff and Volmar, however, argue that the United States breached the non-delegable duty of a landowner to exercise reasonable care for the safety of persons using its property by invitation.

■ In New Jersey, a landowner "has a non-delegable duty to exercise reasonable care for the safety of ... persons using the premises at his invitation." *Kandarge*, 849 F.Supp. at 310 (quoting *De Los Santos v. Saddlehill, Inc.*, 211 N.J.Super. 253, 261, 511 A.2d 721 (App.Div. 1986)); *see also Moore v. Schering Plough, Inc.*, 328 N.J.Super. 300, 305, 746 A.2d 1 (App.Div.2000). Landowners must exercise a duty of reasonable care to protect individuals, including independent contractors, who perform work on their land. *Accardi v. Enviro–Pak Sys. Co.*, 317 N.J.Super. 457, 462, 722 A.2d 578 (App.Div.1999). The duty is not absolute. When the independent contractor is hired to "carry on an activity which by its very nature involves a peculiar or high risk of harm to the contractor's employee, the landowner is generally not responsible for injuries sustained by the contractor's employee in the course of his assigned duties." *Kandarge*, 849 F.Supp. at 310 (quoting *Wolczak v. Nat'l Elec. Prods. Corp.*, 66 N.J.Super. 64, 75, 168 A.2d 412 (App.Div.1961)). The landlord may assume that:

> the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which

are part of or incidental to the very work the contractor was hired to perform.

*Cassano v. Aschoff*, 226 N.J.Super. 110, 115, 543 A.2d 973 (App.Div.1988) (quoting *Donch v. Delta Inspection Servs., Inc.*, 165 N.J.Super. 567, 574, 398 A.2d 925 (Law Div.1979); *Wolczak*, 66 N.J.Super. at 75, 168 A.2d 412). The landowner is not "obliged to eliminate operational hazards which are obvious and visible to the invitee upon ordinary observation and which are part of or incidental to the very work the contractor was hired to perform." *Reynolds v. Lancaster County Prison*, 325 N.J.Super. 298, 321, 739 A.2d 413 (App. Div.1999) (citing *Sanna v. National Sponge Co.*, 209 N.J.Super. 60, 67, 506 A.2d 1258 (App.Div.1986)).

Here, the United States argues that it had no duty to protect plaintiff Ryan from the termite-infested ceiling joists because a renovation project that involved the demolition of ceiling joints includes the risk of working with old, fragile ceiling joists. Thus, it argues that it owed no duty to protect plaintiff from the hazard of working on or under the joists.

There is little doubt that working on a demolition site does involve heightened risk of injury. Many risks are obvious and visible upon ordinary observation, even when termite damage is not a problem—risks like falling off narrow ceiling joists or being hit by falling debris. In addition, here, Peter Young of A.R.G.C. testified that all his employees were told that termite damage had been found in the first seven buildings. (Ruymann Decl., Ex. 2 at Tr. 31:24–32:13.) Thus, by the time work was started on building eight, all parties should have known that the project involved the risk that the structure was termite-infested. Therefore, the United States is correct that under New Jersey's non-delegable landowner duty, it did not

owe plaintiff the duty to protect him from the hazards associated with his job to remove wire from ceiling joists at a demolition site.

However, this Court cannot grant the United States' motion for summary judgment on plaintiff's negligence claims because this non-delegable landlord duty owed to invitees is only one basis for a negligence claim in New Jersey. It is a duty that applies in the absence of other "active negligent conduct." *Dwyer v. Erie Inv. Co.*, 138 N.J.Super. 93, 99, 350 A.2d 268 (App.Div.1975). In other words, even if the landowner does not owe the invitee the non-delegable duty because the hazard is inherent in the invitee's work, the landowner still could owe the invitee a different duty that independently gives rise to a negligence claim. *See, e.g. Port Auth. of N.Y. and N.J. v. Honeywell Protective Servs.*, 222 N.J.Super. 11, 535 A.2d 974, (App.Div.1987) (finding potential contractual basis for liability because contract imposed duty to "erect barricades, ladders, scaffolding, . . .").

Here, there are potential bases under which a factfinder could find liability on the part of the United States. As detailed in part 2(b), *supra*, the record shows that the contract included a Differing Site Conditions clause that stated that, if notified of a problem, the United States must "investigate the site conditions promptly" and modify the contract if necessary. Also included in the record is the Pre–Construction Safety Conference Outline which states that the United States would conduct daily and weekly inspections of the site.

Questions of fact remain on this record which cause this Court to deny summary judgment on the negligence claims. There remain questions as to whether the United States exercised reasonable care in performing its mandatory contractual duties to inspect and survey the work site and modify the contract accordingly,[17] and as to whether any failure on the part of the United States caused plaintiff's injuries.[18]

Therefore, this Court will deny the United States' motion for summary judgment on plaintiff's claims that the United States was independently negligent under the terms of a contract between the Corp of Engineers and Volmar.

### (C) *A.R.G.C.'s Summary Judgment Motion*

In the second summary judgment motion before this Court, A.R.G.C. argues that Volmar's cross-claims against it must be dismissed. This Court has supplemen-

---

**17.** *See, e.g.* Corboy Decl., Ex. H at Tr. 54:3–14 where Paul Jalowski was asked if weekly job site safety surveys occurred and he said, "In general terms I don't know specifically. In general terms they would be done daily if any deficiencies are noticed." *But see Id.* at Tr. 56:3–12, where he said "I do know that daily inspections were conducted and we had inspections from our safety office in New York City district during the course of the project."

**18.** *See* Corboy Decl., Ex. K at 14 where Richard E. Daniels, P.E., of Consulting Engineers & Scientists, Inc., found based on an examination of the site and on depositions and information submitted by the parties that:

the incident fall of Kenneth [Ryan] would have been prevented if Volmar and/or the Corps of Engineers had performed a reasonable engineering survey and revised the demolition plan and Activity Hazard Analysis to require temporary support of ceiling joists until removal of copper wire was completed . . .

He found that the Corps of Engineers breached its duty of care because it had been notified that termite damage was found in all seven buildings prior to the building where plaintiff was injured, but did not inspect the roof joists or trusses because "they were going to be demolished anyway," (*Id.* at 9.), and did not modify the contract to account for possible termite infestation in all the buildings, (*Id.* at 11).

tal subject matter jurisdiction over the cross-claims[19] and will apply New Jersey law.[20] Volmar's five cross-claims against A.R.G.C. seek: (1) contribution pursuant to the New Jersey Joint Tortfeasor's Contribution Law, N.J.S.A. § 2A:53A–1, et seq.; (2) implied indemnification pursuant to New Jersey common law; (3) indemnification pursuant to Article 4.6 of the Volmar/A.R.G.C. subcontract; (4) indemnification based on A.R.G.C.'s breach of the subcontract; and (5) legal representation pursuant to Article 13 of the subcontract which included a liability insurance requirement. A.R.G.C. argues that each claim is barred by law and should be dismissed on summary judgment. This Court will consider each cross-claim in turn.

### 1. Count 1: Joint Tortfeasor's Contribution Law

■ A.R.G.C. argues that the cross-claim for contribution pursuant to New Jersey's Joint Tortfeasor's Contribution Law must be dismissed because it provided workers' compensation to plaintiff Ryan. This Court agrees.

New Jersey law is clear that "the Workers' Compensation Act removes the employer from the operation of the Joint Tortfeasors Contribution Law." *Ramos v. Browning Ferris Indus.*, 103 N.J. 177, 184, 510 A.2d 1152 (1986). The Workers Compensation Act substitutes a statutory remedy for a common law tort remedy so that an employee can receive an "expeditious and relatively certain recovery" for injuries on the job even if the employee was contributorily negligent or the employer was not negligent at all. *Mendoza v. Monmouth Recycling Corp.*, 288 N.J.Super. 240, 246, 672 A.2d 221 (App.Div.1996); *see also Cameron v. G & H Steel Serv., Inc.*, 494 F.Supp. 171, 174 (E.D.N.Y.1980) (applying New Jersey law). The Act thus makes the employee's exclusive remedy against his employer for a work-related injury the statutory workers compensation. He cannot bring a tort claim against his employer. N.J.S.A. 34:15–8; *Stephenson v. R.A. Jones & Co.*, 103 N.J. 194, 199, 510 A.2d 1161 (1986); *Ramos*, 103 N.J. at 183, 510 A.2d 1152.

New Jersey's Joint Tortfeasor's Contribution Law only provides the right of contribution to "joint tortfeasors" who are defined as "two or more persons jointly or severally liable in tort for the same injury to person or property." N.J.S.A. 2A:53A–1. Because an employer is not liable in tort under the Workers Compensation Act, an employer, like A.R.G.C., cannot be a "joint tortfeasor" under the Joint Tortfeasor's Contribution Law, and a third-party tortfeasor, like Volmar, "may not obtain contribution from the employer, no matter what may be the comparative negligence of the third party and the employer." *Stephenson*, 103 N.J. at 199, 510 A.2d 1161; *Ramos*, 103 N.J. at 184, 510 A.2d 1152.

Here, it is clear that A.R.G.C. was plaintiff Ryan's employer and provided workers' compensation to him. (A.R.G.C. Br. at 1; Volmar Br. at 3; Berns Cert., Ex. F.) Therefore, this Court finds that New Jersey's Workers' Compensation Act bars Volmar's first cross-claim for contribution

19. Supplemental jurisdiction applies here because the cross-claims are so related to plaintiffs claims of negligence on the part of the United States, which are properly before this Court under 28 U.S.C. § 1346(b), that they are, "in varying respects and degrees, factually interdependent." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). All of the claims relate to the same alleged workplace accident, to the same government contract, and to the same subcontract.

20. Because the Court is exercising supplemental jurisdiction, it must apply state substantive law to the claims. In the present action, there is no choice of law dispute and New Jersey law applies.

from A.R.G.C., and this Court will grant A.R.G.C.'s motion for summary judgment as to Volmar's first cross-claim.

### 2. Count 2: Common Law Implied Indemnification

A.R.G.C., as plaintiff's employer, argues that the second cross-claim in Volmar's answer must be dismissed because no special relationship exists here that would support a claim of implied indemnification. A.R.G.C. is correct.

■ Although a third party, such as Volmar, cannot seek contribution from an employer, such as A.R.G.C. under the Workers' Compensation Act, it may obtain indemnification from the employer under the theory of implied indemnification. *Ramos,* 103 N.J. at 188, 510 A.2d 1152. The doctrine is narrow, allowing the third party to recover only if (1) a special legal relationship exists between the employer and the third party, and (2) the third party's liability is vicarious. *Id.* at 188–89, 510 A.2d 1152 (citing cases); *Honeywell,* 222 N.J.Super. at 20, 535 A.2d 974. The right to implied indemnity is an equitable remedy that was created "to prevent a result which is regarded as unjust or unsatisfactory." *Honeywell,* 222 N.J.Super. at 20, 535 A.2d 974 (citing *Prosser & Keeton on Torts* (5th ed.) § 51 at 341).

■ A special legal relationship exists between the employer and third party if they are principal and agent, bailor and bailee, lessor and lessee, or union and union member. *Id.* at 189, 510 A.2d 1152 (citing *Hagen v. Koerner,* 64 N.J.Super. 580, 586–87, 166 A.2d 784 (App.Div.1960); 2A Larson, *Workmen's Compensation Law* § 76.51 (1982); *Ruvolo v. United States Steel Corp.,* 139 N.J.Super. 578, 584, 354 A.2d 685 (Law Div.1976)). A contract does not alone create a special relationship between the parties. *Ramos,* 103 N.J. at 190, 510 A.2d 1152 (finding no right to implied indemnification from contract).

*But see Honeywell,* 222 N.J.Super. at 21, 535 A.2d 974 (stating that "cogent argument" can be made that contract created special relationship). In *Ramos,* the Supreme Court of New Jersey found that "allowing [a third party's] contract to haul solid waste to support a claim for implied indemnification against [an employer] would undermine the exclusive remedy provision of the Workers' Compensation Act." 103 N.J. at 190, 510 A.2d 1152; *see also Welch v. Schneider Nat'l Bulk Carriers,* 676 F.Supp. 571, 579 (D.N.J.1987). To allow indemnification in such a situation would "subvert the immunity granted to the employer by the Act." *Stephenson,* 103 N.J. at 199, 510 A.2d 1161. This is because there is always a contract between a vendor and an employer-vendee that would eliminate the employer's immunity and require it to pay for injuries to its employee caused by the vendor's product. *Id.* The same is true with the relationship between general contractor and employer-subcontractor. If indemnification were implied on the basis of a contract between the two, which was silent regarding indemnification, the employer-subcontractor would always be required to indemnify the contractor for damages to his employees even though the employer already paid worker's compensation to the employee. *See Mautz v. J.P. Patti Co.,* 298 N.J.Super. 13, 21, 688 A.2d 1088 (App.Div.1997) (stating that "implied indemnity is obviously disfavored in this context" when case involved subcontract).

■ Volmar has not argued that it has a special relationship with A.R.G.C. Instead, it argues that it is premature for this Court to find that there is no implied indemnification. (Volmar Br. at 8–9.) Volmar is correct that this Court cannot determine whether Volmar was liable on the pleadings alone. However, this determination is only relevant to a finding of implied indemnification if the Court first finds that the parties enjoy a special rela-

tionship. On this point, this Court will follow the New Jersey Supreme Court's direction in *Ramos* and will find that Volmar and A.R.G.C. do not enjoy a special relationship here. Thus, this Court does not need to determine whether Volmar's liability is vicarious, because Volmar is not entitled to implied indemnification from A.R.G.C. as a matter of law. Therefore, this Court will grant A.R.G.C.'s motion for summary judgment on Volmar's second cross-claim.

### 3. Count 3: Contractual Indemnification

In Count 3 of its cross-claims, Volmar alleges that Article 4.6 of its subcontract with A.R.G.C. requires A.R.G.C. to indemnify Volmar for any claims relating to either Volmar's or A.R.G.C.'s or an employee's negligence. A.R.G.C., however, argues that Article 4.6 of the subcontract does not promise indemnification for any claims under the facts of this case.

 It is clear that the Workers' Compensation Act does not preclude an employer from assuming a contractual duty to indemnify a third party. *Ramos*, 103 N.J. at 191, 510 A.2d 1152. Indemnification contracts are permitted in New Jersey to allow companies "to allocate as between them the cost or expense of the risk of accidents apt to arise out of construction projects on a fairly predictable basis." *Buscaglia v. Owens–Corning Fiberglas*, 68 N.J.Super. 508, 515, 172 A.2d 703 (App. Div.1961). They are generally to be interpreted in accordance with the rules governing the construction of contracts. *Ramos*, 103 N.J. at 191, 510 A.2d 1152 (citing *Cozzi v. Owens Corning Fiber Glass Corp.*, 63 N.J.Super. 117, 121, 164 A.2d 69 (App. Div.1960)). However, if the indemnification contract is ambiguous, it must be strictly construed against the party seeking the indemnification. *Longi v. Raymond–Commerce Corp.*, 34 N.J.Super. 593, 603, 113 A.2d 69 (App.Div.1955). The Court cannot construe a clause so that it requires one party to indemnify another party for losses caused by that other party's own negligence unless such intention is unequivocally expressed in the contract. *Ramos*, 103 N.J. at 191–92, 510 A.2d 1152 (citing cases); *Pingaro v. Rossi*, 322 N.J.Super. 494, 510, 731 A.2d 523 (App. Div.1999).

 Here, the indemnification clause is not ambiguous. Article 4.6 of the subcontract clearly states, in pertinent part:

#### 4.6 Indemnification

**4.6.1** To the fullest extent permitted by law, the Subcontractor [A.R.G.C.] shall indemnify and hold harmless the ... Contractor [Volmar] ... from and against claims, damages, losses and expenses, including but not limited to attorney's fees ... arising out of or resulting from performance of the Subcontractor's Work under this Subcontract, provided that such claim, damage, loss or expense is attributable to bodily injury ... but only to the extent caused in whole or in part by the negligent acts or omissions of the Subcontractor [and] ... anyone directly or indirectly employed by them ... regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder ...

**4.6.2** In claims against any person or entity indemnified under this Paragraph 4.6 ... the indemnification obligation under this Paragraph 4.6 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Subcontractor ... under workers' or workmen's compensation acts ...

(Berns Cert., Ex. D at 6.) The clause, taken from the American Institute of Architects' "Standard Form Agreement Between Contractor and Subcontractor," is,

in the words of the New Jersey Appellate Court, "clear and unambiguous." *Mautz v. J.P. Patti Co.*, 298 N.J.Super. 13, 21, 688 A.2d 1088 (App.Div.1997). It states that A.R.G.C. has an obligation to indemnify Volmar, but only to the extent that the claim was caused by A.R.G.C.'s negligence or by the negligence of an A.R.G.C. employee. *Id.* The contract makes clear that A.R.G.C.'s obligation to indemnify Volmar for the negligence of A.R.G.C. and its employees remains "regardless of whether [the claim] is caused in part by [Volmar]" and is not "limited by [compensation] payable by [A.R.G.C.] under worker's compensation acts." *Id.; (see also* Berns Cert., Ex. D at §§ 4.6.1, 4.6.2.)

The terms of the contract do not give A.R.G.C. the obligation to indemnify Volmar for any portion of the claim caused by Volmar's negligence. *Mautz*, 298 N.J.Super. at 21, 688 A.2d 1088. Volmar, therefore, cannot seek indemnification from A.R.G.C. to the extent that Volmar's negligence caused plaintiff Ryan's injuries. However, Volmar *can* seek indemnification from A.R.G.C. for damages and for legal fees to the extent that the negligence of A.R.G.C. or its employees caused Ryan's injuries. This Court, therefore, cannot grant A.R.G.C.'s motion for summary judgment if there is a question of fact that could show that A.R.G.C. or one of its employees was negligent.

The record is unclear on this matter; questions of fact remain regarding wheth-er A.R.G.C. breached any of its duties under the Subcontract, such as the duties to "take reasonable safety precautions," to "comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations, and orders of public authority," and to "implement all safety measures in full accordance with OSHA requirements and Army Corps of Engineers Safety Manual." (Berns Cert., Ex. D at 5, 9.) Likewise, questions of fact remain regarding whether A.R.G.C. knew or should have known of the termite damage in the eighth unit and whether Ryan was properly instructed by A.R.G.C. employees when he was told to remove wire at ceiling height. With such questions of fact, this Court cannot grant A.R.G.C.'s motion for summary judgment on Volmar's third cross-claim to the extent that it seeks indemnification for A.R.G.C.'s negligence.[21] Therefore, this Court will grant in part A.R.G.C.'s motion for summary judgment on Volmar's third cross-claim to the extent it seeks indemnity for claims, damage, loss, or expense caused by Volmar's or its employees' negligence and will deny in part the motion to the extent that it seeks indemnity for claims, damage, loss, or expense caused by A.R.G.C.'s or its employees' negligence.

#### 4. Count 4: Breach of Contract Indemnification

■ Volmar argues that A.R.G.C. should indemnify it for Volmar's negli-

---

**21.** A.R.G.C. argues that because it cannot be found liable in tort under the Worker's Compensation Act, it cannot be the cause of a tort that would trigger the indemnity provision of the subcontract. (A.R.G.C. Br. at 8–9.) This argument is clearly flawed due to the unambiguous, though limited, duty of indemnification which A.R.G.C. undertook toward Volmar. A.R.G.C. admitted that "the Workmen's Compensation Act does not bar an employer from assuming a contractual duty to indemnify a third party through an expressed indem-nification agreement." (A.R.G.C.'s Br. at 11 (citing *Ramos*, 103 N.J. at 191, 510 A.2d 1152.)) By allowing employers to enter express contractual indemnification agreements, the New Jersey Supreme Court clearly allows employers to accept responsibility for damages it negligently causes. Employers may be protected from such damages under the Worker's Compensation Act, but it may forgo such protection by entering an indemnification agreement. *See Ramos,* 103 N.J. at 192, 510 A.2d 1152.

gence because A.R.G.C. breached the subcontract's requirement that A.R.G.C. comply and implement all necessary safety measures. A.R.G.C. argues that it cannot be found negligent because of the Workers' Compensation Act, and that, even if it were, any alleged breach of contract could not expand the express indemnification agreement to require A.R.G.C. to indemnify Volmar for Volmar's actions. This Court finds that a breach of contract does not expand a contract's indemnification clause and will grant A.R.G.C.'s motion on this count.

As noted *supra* in section C(3), under New Jersey law, indemnification contracts must be strictly construed against the party seeking the indemnification. *Longi v. Raymond–Commerce Corp.*, 34 N.J.Super. 593, 603, 113 A.2d 69 (App.Div.1955). As a result, when Judge King, for the New Jersey Superior Court, Appellate Division, wrote the court's decision regarding a construction subcontract that included a section with subcontractor safety requirements, he stated:

> This section [regarding safety responsibilities] may provide some guidance to the trier-of-fact on remand on the intent of the parties with respect to safety responsibilities on the job. However, we are satisfied that [the indemnification section] is the only portion of the contract which creates a contractual right to indemnification. This section is quite specific and we conclude it was the only loss-shifting mechanism contemplated in the contract.

*Mautz*, 298 N.J.Super. at 22, 688 A.2d 1088.

Here, as in *Mautz*, the contract included a section that imposed safety responsibilities on A.R.G.C. (Berns Cert., Ex. D at § 4.3.) [22] However, in determining whether A.R.G.C. must indemnify Volmar, it is irrelevant whether A.R.G.C. breached the subcontract's safety terms. The indemnification provision in section 4.6 [23] is the only provision that determines A.R.G.C.'s indemnification duties. This Court will grant A.R.G.C.'s motion for summary judgment on Volmar's fourth cross-claim.

### 5. Count 5: Contractual Insurance Provision

In Count 5 of Volmar's cross-claims, Volmar seeks insurance coverage from A.R.G.C., including legal representation in this action. A.R.G.C. argues that summary judgment should be granted in its favor because it provided the requisite insurance coverage and because it did not have to cover Volmar's defense in this proceeding. Volmar argues that summary judgment is inappropriate because questions of fact remain regarding what insurance coverage was required by the contract. [24]

**22.** Section 4.3 provides, in part:

The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property in accordance with the requirements of the Prime Contract. The Subcontractor shall report to the Contractor within three days an injury to an employee or agent of the Subcontractor which occurred at the site....

**23.** *See supra,* section C(3).

**24.** Volmar also argues that this Court should defer consideration of this matter until it is resolved by a pending action in the Superior Court of New Jersey, Law Division. (Volmar Br. at 15; Corboy Cert., Ex. I.) However, this Court will exercise jurisdiction to consider the claim in accordance with *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 54

The insurance provision at issue in the contract states as follows:

**ARTICLE 13**

**INSURANCE AND BONDS**

**13.1** The Subcontractor [A.R.G.C.] shall purchase and maintain insurance of the following types of coverage and limits of liability: *An insurance certificate is required and shall be furnished as called for in the contract. Insurance policy shall name "VOLMAR SERVICES, INC." as additionally insured. Subcontractor should inform Volmar Services in writing 30 calendar days in advance, if there are any changes or cancellation to policy.*

**13.2** Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Subcontractor's Work until date of final payment and termination of any coverage required to be maintained after final payment.

**13.3** Certificates of insurance acceptable to the Contractor shall be filed with the Contractor prior to commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Article 13 shall contain a provision that coverages afforded under the policies will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor.

(Berns Cert., Ex. D at 14, emphasis in original.)

A.R.G.C. asserts that it complied with the contract's requirements and has presented a copy of its certificate of liability insurance that includes Volmar as an "additional insured" for the Garden Terrace project at Fort Dix. (Berns Cert., Ex. E.) It also presents Volmar's declaratory judgment complaint filed with this Court in which Volmar states that:

[p]ursuant to the terms of the subcontract, ARGC obtained a policy of insurance with American Alternative Insurance Corporation for the Fort Dix Housing Project and specifically named Volmar Services, Inc. as an "additional insured" under this policy.

(Berns Cert., Ex. G at ¶ 9.) It therefore argues that it fulfilled its contractual obligation and did not need to ensure that Volmar would be provided defense counsel for this action.

This Court finds that an issue of fact remains about the insurance required by the contract because the parties did not submit the specifications of the contract. The subcontract stated that the "types of coverage and limits of liability ... *shall be furnished as called for in the contract,*" (Berns Cert., Ex. D at Art. 13.1), but the parties did not include anything that discloses what was "called for in the contract." The information existed as A.R.G.C. submitted a letter sent to Volmar which stated that "[p]rior to issuance of the Notice to Proceed you must ... furnish evidence of insurance in the amounts required on page I–1 of the specifications." (Berns Cert., Ex. D at 1.) Without page I–1 of the specifications, this Court cannot decide whether A.R.G.C. provided the requisite insurance by naming Volmar as an

---

L.Ed. 762 (1910), cited in *NYLife Distribs., Inc. v. Adherence Group, Inc.*, 72 F.3d 371, 376 (3d Cir.1996), which states that in the absence of the application of an abstention doctrine:

[t]he rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same

matter in the Federal court having jurisdiction, for both the state and Federal courts have certain concurrent jurisdiction over such controversies, and when they arise ... the Federal jurisdiction may be invoked, and the cause carried to judgment, notwithstanding a state court may also have taken jurisdiction of the same case.

"additional insured" on its liability insurance policy. As a result, this Court will deny ARGC's motion for summary judgment without prejudice [25] on this count.

## III. *CONCLUSION*

Therefore, for the reasons discussed herein regarding the federal defendants' motion for summary judgment on the claims of the plaintiff and the cross-claims of Volmar, this Court will partially deny the federal defendant's motion for summary judgment. Summary judgment will be granted in favor of the United States Army, United States Air Force, and United States Corps of Engineers on all the claims in plaintiff's complaint and on all the cross-claims in Volmar's answer. Summary judgment will also be granted in favor of the United States on the claims in plaintiff's complaint and on the cross-claims of Volmar only to the extent they relate to the negligence of either Volmar or A.R.G.C. However, summary judgment will be denied as to the claims in plaintiff's complaint and on the cross-claims of Volmar to the extent they relate to the negligence of the United States itself due to the breach of its mandatory contractual obligations with Volmar concerning inspection and site survey in connection with the demolition work.

This Court has also considered A.R.G.C.'s motion for summary judgment on the cross-claims of Volmar, and for the reasons explained in this opinion will grant A.R.G.C.'s motion for summary judgment as to cross-claims one, two, and four, will deny A.R.G.C.'s motion for summary judgment as to cross-claim five, and will grant in part and deny in part A.R.G.C.'s motion

for summary judgment as to cross-claim three.

The accompanying Order is entered.

## ORDER

This matter having come before the Court upon the motion of defendants United States of America, United States Air Force, United States Army, and United States Army Corps of Engineers for summary judgment on the claims contained in the complaint of plaintiff Kenneth Ryan, pursuant to Rule 56, Fed.R.Civ.P. [Docket Item 26–1] and the motion of defendant A.R.G.C., Corp. for summary judgment on the cross-claims contained in the answer of defendant Volmar Services, Inc., pursuant to Rule 56, Fed.R.Civ.P., [Docket Item 33–1]; and the Court having considered the written submissions of the parties; and for the reasons expressed in Opinion of today's date;

IT IS this ___ day of December, 2002, hereby

ORDERED that motion of defendants United States of America, United States Air Force, United States Army, and United States Army Corps of Engineers for summary judgment on the claims contained in the complaint of plaintiff Kenneth Ryan [Docket Item 26–1] be, and hereby is, *GRANTED IN PART* to the extent that it asserts claims against the United States Air Force, United States Army, and United States Army Corps of Engineers, and to the extent that it asserts claims against the United States of America for negligence caused by Volmar Services, Inc. or A.R.G.C., Corp., and *DENIED IN PART* to the extent that it asserts claims against the United States of America for the direct negligence of the United States

**25.** If upon examining the missing specification page I–1 Volmar agrees A.R.G.C. has fulfilled its insurance procurement obligation, it is invited to voluntarily dismiss its fifth crossclaim against A.R.G.C. without additional litigation on this point.

of America or its employees with respect to breach of the contractual duty to inspect and survey the work site in connection with the demolition work;

IT IS FURTHER ORDERED that all claims against United States Air Force, United States Army, and United States Army Corps of Engineers, be, and hereby are, *DISMISSED WITH PREJUDICE;*

IT IS FURTHER ORDERED that all claims against United States of America alleging negligence of Volmar Services, Inc. or A.R.G.C., Corp., be, and hereby are, *DISMISSED WITH PREJUDICE;*

IT IS FURTHER ORDERED that the motion of defendant A.R.G.C. Corp. for summary judgment on the cross-claims contained in the answer of defendant Volmar Services, Inc., pursuant to Rule 56, Fed. R. Civ. P., [Docket Item 33–1], be, and hereby is, *GRANTED* as to cross-claims 1, 2, and 4, and *DENIED* as to cross-claim 5;

IT IS FURTHER ORDERED that the motion of defendant A.R.G.C. Corp. for summary judgment on cross-claim 3 contained in the answer of defendant Volmar Services, Inc., [Docket Item 33–1], be, and hereby is, *GRANTED IN PART* to the extent that it seeks indemnity from A.R.G.C. Corp. for losses caused by Volmar's negligence, and is *DENIED IN PART* to the extent that it seeks indemnity from A.R.G.C. Corp. for losses caused by the negligence of A.R.G.C. Corp. or its employees; and

IT IS FURTHER ORDERED that cross-claims 1, 2, and 4 within the answer of defendant Volmar Services, Inc., be, and hereby are, *DISMISSED WITH PREJUDICE* as to defendant A.R.G.C., Corp. in their totality, and that cross-claim 3 be, and hereby is, *DISMISSED WITH PREJUDICE* as to defendant A.R.G.C. Corp. to the extent that it seeks indemnity

from A.R.G.C. Corp. for losses caused by Volmar's negligence.